**Walter Lee SANDERS, Plaintiff in Error,**

v.

**STATE of Oklahoma, Defendant in Error.**

No. A–12683.

Court of Criminal Appeals of Oklahoma.

June 24, 1959.

Frank Leslie, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

This case involves burglary with explosives,· and comes from the district court of Pontotoc County, where the plaintiff in error, hereinafter referred to as defendant, was tried before a jury, convicted and the penalty assessed by the jury at confinement in the State Penitentiary for a period of 30 years. By statute the minimum sentence is 20 years, and the maximum 50 years. 21 O.S.1951 § 1441.

For reversal counsel fails to comply with Rule No. 7 of this Court and present his grounds for reversal or specifications of error under separate propositions, but argues without heading and at random. We shall treat the essential propositions of the petition in error covered in defendant's brief.

The allegations of the information in part read:

"That is to say, the defendants Romey Lee Wilcoxon, Walter Lee Sanders and Alonzo Scott Painter did, in said county and state, at the above named time and place, unlawfully, wilfully, and feloniously enter a certain store building in the city of Ada, Oklahoma, said building being then and there controlled, occupied, and used by Standard Food Market, then and there unlawfully, wilfully, and feloniously by the use of and by the aid of nitroglycerine, dynamite, or other explosives, attempt to open a certain safe and receptacle then and there kept in the said store building by the said Standard Food Market, and then and there used by the said Standard Food Market for the secure keeping of money and other valuable property, without the consent of the said Stand-

ard Food Market, and with the felonious intent of the said Romey Lee Wilcoxon, Walter Lee Sanders, and Alonzo Scott Painter then and there to crack and open said safe by the use of and by the aid of said explosives; contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Oklahoma."

The evidence is undisputed but that the Standard Food Market burned and was a total loss as result of the explosion alleged in the information.

The record discloses that there was no direct evidence to place defendant at the Standard Food Market, Ada, where he could participate in the crime charged, except by the testimony of one of his co-defendants.[1] The defendant applied for and was granted a severance, or separate trial, from those charged with him. His co-defendant, Alonzo Scott Painter testified for the State.

Under such circumstances in examining the testimony we have kept in mind, as suggested by counsel for the defendant, that a conviction upon the uncorroborated testimony of an accomplice is prohibited by statute. 22 O.S.1951 § 742 reads:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

Next is the question of the sufficiency of the corroboration. A long line of cases from this Court is listed in the cumulative pocket parts under the section of the statute quoted. A typical case is Blumhoff v. State, 72 Okl.Cr. 339, 116 P.2d 212,

---

1. Where two or more persons are jointly charged with commission of a felony and are separately tried, each is a competent witness for or against a co-defendant if ·he voluntarily elects to be-

come a witness. Richardson v. State, 76 Okl.Cr. 101, 134 P.2d 375. And see Lucas v. State, 68 Okl.Cr. 359, 98 P.2d 933; Morris v. State, 68 Okl.Cr. 147, 96 P.2d 88.

213, paragraphs 1, 2 and 3 of the syllabus reading:

"Evidence corroborative of an accomplice need not directly connect the accused with the commission of the crime. It is sufficient, although circumstantial, if such evidence tends to connect him with its commission.

"The testimony of an accomplice to sustain a conviction need not be corroborated in every particular in detail. The rule is that the testimony of an accomplice must be corroborated by such other evidence of material parts of his testimony as will tend to connect the defendant with the commission of the offense.

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

We shall therefore commence by a consideration of the evidence of the co-defendant Painter:

Alonzo Painter testified that he lived in Copan, Oklahoma; that on March 11, 1958 he came to Tulsa and phoned Romey Wilcoxon at Raymond Gordon's home just off Peoria, at about the twenty-nine hundred block; that he had a previous agreement with his codefendants Walter Lee "Chief" Sanders and Wilcoxon that they were to meet him at the bus depot. He said that he did phone Wilcoxon and that Wilcoxon picked him up at the bus station and then picked the defendant Sanders up at the train depot, and the three of them then drove out to the Gordon residence. He said they sat around at the Gordon residence for about two hours and drank coffee; that several weeks previously they had talked about going to Ada and that at this time they planned on what time they would leave for Ada, what time they would get there, and what time they would get back to Tulsa. He said that they had agreed to burglarize a supermarket, but he did not know in advance the name of the place that was to be robbed. He said they figured the place they would enter would have about five cash registers, and that they would get around $5,000.

Witness further testified that he and defendant Sanders and Wilcoxon left the Gordon residence in the Gordon car about 9:30 in the evening and drove out to an oil field lease and picked up about a pint of nitroglycerine; that they got some tools at the Gordon garage consisting of a drill, some punches and a couple of jimmy bars, before leaving, and that there were some tools already in the car. He said that all of them had firearms; that he had a .32-20, and that Sanders had a .22 with a large grip, and that Wilcoxon had a .25 Beretta. He identified the firearms mentioned, which were later received into evidence. He also identified a "jimmy bar" that was peculiar in that it had a hammer head welded on that made possible better leverage. He said that they had in the car a total of four or five jimmy bars, two drills, ten or twelve punches and drill bits, and a sledge hammer. He said that he and Sanders and Wilcoxon had agreed to share equally in anything taken in the burglary; that is, one-third each. He said that they had the nitroglycerine in a half pint Old Forrester whiskey bottle, and that after getting it they drove back through Tulsa and down through Sapulpa to Ada. He said they had some dynamite caps, copper wire and a flashlight battery for the purpose of setting off the nitroglycerine.

Witness said they arrived in Ada about four o'clock in the morning of March 12, 1958; that they drove in front of the store to be entered, circled the block and parked on the street back of the store, got out of their car and cut through between houses and walked around to the front of the Standard Market; that an occasional car would pass and they saw a police car parked in front of a cafe a block and a half or two blocks away. He said that the three of them brought from the car a drill, two or

three jimmies, a sledge hammer, six or eight punches, the nitroglycerine and caps, and wire. That Wilcoxon "jimmied" the left front door, that it took only about ten or fifteen seconds to do this, and gain entrance. They checked the cash registers but found only $20 or $25 in silver, which they took; that it was in a register in a little office-like enclosure; that there were some foreign coins but they laid them back. He said that they found a "real good safe" and they decided to knock the nob off and drive the shaft back and pour in nitroglycerine and "blow" it. He said that defendant Sanders watched for the police while he and Wilcoxon worked with the safe. He said that they took about an ounce of nitroglycerine from the bottle in the car and took it into the store in a plastic doll-nursing bottle; put some gauze in the hole in the safe and poured in the nitroglycerine on the gauze to keep it in one spot, and attached the blasting cap. He said they put the blasting cap into the hole in the safe where the gauze was and they had about 30 feet of wire and ran it in back of a bread case, and had a flashlight battery and set the two ends of the wire to the flashlight battery and caused the blasting cap to go off, which in turn caused the "nitro" to explode. He said they placed a number of sacks of flour on the safe to keep the explosion down. He said the explosion failed to open the safe; that it was late and morning coming on, and they decided they had better leave and they pried an inside padlock off the rear door and left the store. He identified State's Exhibit 9 as the hammer they used in attempting to punch the safe. He also identified a drill and some punches.

Witness stated that the explosion caused some crepe paper on the ceiling to catch fire, but they thought they put it out. Said he: "We didn't know until that afternoon—until we got arrested and was back down here, that the store had burned down."

Witness said that they removed their tools from the store as they left and returned by their car to Tulsa; that Wilcoxon drove back and that witness sat in the front seat and defendant Sanders rode in the back seat. Witness said that he went to sleep, and awoke once when they stopped and got three beers, and a second time on the river bridge at Tulsa on West Eleventh Street; that "Sanders said something about Jimmie Jackson [a detective] seeing him, or following us, or something". He said after they turned onto Riverside Drive the officers stopped them.

On cross-examination witness admitted, as he had on direct examination, that he had been convicted of grand larceny and served two years at Granite Reformatory, and was convicted a second time for grand larceny and served three years at McAlester. He said this was the first time he had been arrested in 15 years. He denied that he had ever been in the store in Ada prior to the breaking in that he had detailed. He denied that he had been promised anything by the officials to testify, but had done so on advice of counsel, Attorney Lee West, who was then in court with him.

The State used as its principle witness in corroboration of the testimony of the accomplice Painter, Tulsa Police Officer Harvey Sollars.

Counsel for defendant filed a written motion to suppress the evidence of the arresting officer, Sollars, on the ground that the arresting officer did not have a warrant for arrest of defendant; that he was not in the commission of any offense in the presence of the officer, either a felony or a misdemeanor; and that the seizure following the arrest was void.

The court excused the jury and counsel for the defendant called officer Sollars, who said that he was an officer with the Tulsa Police Department, and that he was one of the officers making the arrest in the case; that he went to work the morning of March 12, 1958 at 6 A.M.; that the first thing he did was to drive by the Piermont Hotel on First Street; that he knew defendant Sanders lived there but he did not see him around anywhere, and that he was not particularly looking for him; that he always checked down at Piermont Hotel each morning, and that he then drove on into West Tulsa to

the Gingham Girl's Cafe and he said that he did not see any of the defendants there. Witness drove north on Southwest Boulevard towards Tulsa, and he stated that Sgt. Jimmie Jackson was in another police car back of him, that witness was following a 1951 Ford and was attempting to stop it for speeding, that it was going 30 miles an hour in a 20 mile zone, and that Sgt. Jackson advised him by car radio that defendant Sanders was in the rear seat of the Ford. Witness said that he did not recognize Wilcoxon, who was driving the car, or the other occupants until just prior to stopping the car. He admitted that there were many cars on the street, but denied that they were being driven as fast as the Ford he stopped. The officer said that he recognized the car tag also, which was not registered in the name of any of the occupants of the car.

Witness said that he did not possess a warrant for the arrest of any of the occupants of the car in question, and did not have a search warrant. He insisted that he stopped the car by reason of speeding, and that he filed a speeding charge against the driver.

On cross-examination witness said that he drank some coffee at the Gingham Girl's Cafe with Sgt. Jackson, and later they left. He denied that he recognized any one in the Ford car before taking after it for speeding; and that he had "clocked" it for speeding before he recognized any one in it.

Witness denied on re-direct examination that he recognized the car license until he had started in pursuit of the car; that when he did recognize the occupants he radioed for help and other police cars soon appeared.

█ Based on the above evidence, the court overruled the motion to suppress, and from this evidence we find ample basis in the record to support the ruling of the court, and such being true, we are bound by such ruling. See Mitchell v. State, 73 Okl. Cr. 184, 119 P.2d 99; Griffin v. State, 90 Okl.Cr. 90, 210 P.2d 671.

█ Having arrested the defendants for a misdemeanor committed in his presence,

to-wit: Speeding, and having recognized the motorists as dangerous characters, the officers had a right to search their persons and their immediate presence for firearms. They found firearms. See Scott v. State, 84 Okl.Cr. 171, 180 P.2d 196; Brinegar v. State, 97 Okl.Cr. 299, 262 P.2d 464.

The jury was recalled and officer Sollars testified substantially as he had on motion to suppress as to the cause for the arrest. And as to the facts of the actual arrest, he said that when he got the Ford stopped for speeding, and then knowing who the occupants were, he stopped his car behind the Ford, and Sgt. Jackson stopped behind him, and that he proceeded cautiously to the right hand side of the car while Sgt. Jackson proceeded to the driver's side. Said he:

"I stopped next to the right hand door, where Alonzo Painter was in the front seat, and there had been some commotion inside of the vehicle as I approached. Walter Sanders had moved over to his left and Alonzo Painter had bent forward in the seat. And when Sergeant Jackson approached the driver's side he called for Mr. Wilcoxon to get out of the vehicle, and when he did this we saw a jacket lying in the front seat and that had some red and yellow wires sticking out of a pocket. Also in the back seat, on the floorboard, there was a box containing an electric drill, a sledge hammer, punches—and on the floor of the front seat, in front of Alonzo Painter, there was a large pry bar. Upon seeing these, I requested that Mr. Painter and Mr. Sanders get out of the car, and they did so on my side of the car— the right hand side."

Witness further identified electric blasting caps found in the pocket of the jacket in the Ford car, a roll of blue covered wire, $19.71 in change, some cotton wadding, and a ray-o-vac flashlight battery. He said that he placed all of the said contents of the jacket pocket in an envelope and turned it over to Sheriff Broadrick of Ada the same afternoon. This envelope was iden-

tified as State's Exhibit No. 5. He also identified a .25 Beretta automatic recovered from the left-hand shirt pocket of Romey Lee Wilcoxon at the time of the arrest and search; a .32–20 revolver removed from under the right-hand front seat of the 1951 Ford; and a .22 Cal. Iver Johnson Revolver which was removed from between the cushions in the rear seat of the Ford, just to the left of where defendant Sanders was seated. He said that when he arrested defendant, defendant was leaning directly towards where he recovered the pistol. These items were received in evidence.

Witness further testified that he located a box behind the front seat on the floorboards containing an electric drill, a sledge hammer with handle cut off, a number of punches and chisels, and in the rear seat, wrapped in a pair of gray striped coveralls, he found a glass bottle with an Old Forrester whiskey label on it that contained an amber-colored liquid, about three-fourths full, which he turned over to Mr. W. Alton Turner of the Pringle Powder Company, Tulsa. He said that he initialed the tools and turned them over to Sheriff Broadrick of Ada. Witness further identified a steel pry bar that had a hammer-head welded on it, and which he said he found on the front floor of the Ford.

As to the amber colored liquid, witness said that on March 31, 1958, along with Mr. Jack Purdy of the Tulsa Police Department, he went with Mr. Turner to the Pringle Powder Company's magazine plant just north of Tulsa, and that Mr. Turner poured a fourth of an ounce of the liquid into a small glass bottle and they attached a number 8 blasting cap and a length of powder fuse, which ignited and set off quite an explosion.

Witness further said that several charges were filed on the defendants in Tulsa County, and they were placed in the city jail, and their trousers and shoes were taken, and these items were turned over to Sheriff Broadrick the afternoon of the arrest.

W. Alton Turner testified that he was district representative of the Pringle Powder Company and had worked with nitroglycerine and various explosives for 23 years. He testified substantially as did officer Sollars as to exploding a fourth ounce of the amber liquid taken from the Ford car in which defendant was riding. He identified the liquid in question as an explosive.

Leonard Wilson testified that on March 12, 1958 he was the manager of the Standard Food Market, 520 East Main Street, Ada. He said that the store faced south and in the southwest corner was an office and that between the office and the front glass was the store safe where they kept their money. They had three cash registers. They had a cash till in an office desk and would put the bills in the safe each night, but left the loose change (including rolls of pennies) in the office till. At the time of the robbery and fire they had some Canadian coins in the office till, and between $20 and $30 in cash. He said that on the morning of March 12, 1958 at about five minutes after five o'clock he got a telephone call that the store was on fire. That he finally gained entrance to the building; that everything was pretty well burned; that part of the office was still there; that eventually they found the knob of the safe that showed to have been knocked off. They found some pennies.

Max Wilson testified that he was the assistant manager of the Standard Food Market, Ada, on March 12, 1958 and testified substantially as Leonard Wilson, the manager. He said the food market was a complete burn-out, testified that he got in the store the afternoon after the fire in the morning, and found the knob on the top of the safe missing and the safe to have been chiseled and beaten up, but that it had not been opened.

Billy Ellis, fire chief of Ada testified that he received a fire alarm at 5:08 a. m. March 12, 1958, and found the Standard Food Market, Ada, ablaze; that the fire from

visible indications that he detailed showed that it started in the front end of the building; that it was about an hour before the fire was under such control as to permit him to gain entrance to the building; that he examined the safe. Said he: "I found a piece of wire twisted around the knob of the safe, which is used as a handle, in opening the safe door." Witness was then handed State's Exhibit 1 and identified the exhibit as the wire that he took off the knob of the safe and said that he marked the exhibit of March 12, and gave it the same day to Chester Stringer, head of the Arson Bureau in the State Fire Marshal's office. He further stated that he found some more wire near the safe identical with that found on the safe. He identified this wire as State's Exhibits 2 and 3. He also gave this wire to Chester Stringer.

Chester Stringer, State Crime Bureau Agent, testified that on March 12, 1958 he went to Ada to investigate a fire and burglary; that about 8:25 p. m. on said day he took samples of dirt or soil from shoes of the defendant and those arrested with him; that when he took samples from their shoes, Sanders and Painter were in the county jail, and Wilcoxon was in the city jail.

Witness said that he put the samples of soil in three separate envelopes and placed them in a larger envelope, which was marked as State's Exhibit 12; that the number one envelope contained in the larger envelope (Exhibit 12) was the sample he took from the shoes of W. L. Sanders, the defendant; that number two was the sample taken from the shoes of R. L. Wilcoxon, and number three was the sample taken from the shoes of Alonzo Painter. Witness also testified that he took a sample of soil (Exhibit 13) from the alley just outside of the back door of the building.

Witness Stringer also identified State's Exhibits 1, 2 and 3, pieces of wire that had been picked up by Fire Chief Ellis in the building after the fire. The exhibits had been turned over to the witness by Chief

Ellis to be delivered to the laboratory of the State Crime Bureau.

After identifying these various exhibits, Mr. Stringer said that he delivered them to P. L. Wood, the chemist in charge of the laboratory of the State Crime Bureau.

On cross-examination the witness testified that he had observed that the top part of the soil in the alley back of the store had gravel in it, but said that he did not know what percentage of gravel was in the soil, and could not say whether it was natural soil or had been put there by someone.

Pierre L. Wood testified that he was a chemist with the State Crime Bureau. He identified State's Exhibit 4 as an electric blasting cap and two pieces of wire, and identified Exhibit 1 and said that it was a section of copper wire which had been burned, and that he had made tests and experiments with those items.

Witness said that he made a spectrographic examination of the wire and the burned insulation material and compared it with the wire attached to the blasting cap, and that they compared favorably, in that the same elements were present in both sections of wire which he said would indicate that they came from the same source.

Witness then identified Exhibit 12, which he said contained three envelopes containing the soil samples delivered to him by Chester Stringer, and identified Exhibit 13 and said it was a soil sample submitted to him by Mr. Stringer, and that he made a "spectrographic comparison of these three samples, as compared with this sample" and that they compared favorably in that the same material was present in each one to the other. Also, that he did a density gradient determination which determines the density of the soil, and that also compared favorably.

Chemist Wood then, by use of some two pages of typewritten matter, explained to the jury the formula or tests used in making his analysis. He identified State's Exhibits 9 and 14—Exhibit 9 as a sledge ham-

mer and two chisels; and Exhibit 14 as a paint sample he requested and that was submitted to the laboratory by the county attorney's office. Witness further testified:

"This material or this paint on both of the chisels and from the edge of the sledge hammer here, I placed that in a spectrographic electrode—an electrode for each sample of paint; and I, also, took a sample of the green paint that I requested—these flakes of green paint, and examined it, spectrographically, and the materials present in that paint appear in the same ratio and proportion. The density gradient method, the paint particles float at the same level, which indicates that the paint came from the same source."

On cross-examination the witness was asked if the sample (Exhibit 13) taken from the alley behind the store showed a lot of gravel in it, and he answered that he did not attempt to grade it as to percentage of gravel; that he took the fine materials and used it in that such materials contained more of the silica, the calcium and the iron of which they were going to make the analysis. Said he: "The fine soil has more specific identification to it than the gravel would."

W. M. Broadrick, sheriff of Pontotoc County, testified that on March 12, 1958 he called at the police station in Tulsa and received the three defendants, Sanders, Wilcoxon and Painter, and took them to Ada in his car; that the first time he saw them in jail at Tulsa they they didn't have shoes on; that he received their shoes inside the jail. Witness testified that he drove his car to the rear entrance of the jail, and that the three defendants came down the stairway and got into his car, and the defendants did not get outside the building before getting into his car. The prisoners were placed in jail in Ada.

Witness identified State's Exhibit 4 as an electric dynamite cap and wire turned over to him by the Tulsa police department. He examined Exhibit 5 and said that it was the money, in regular money wrappers, he had received from the Tulsa Police Department, and examined Exhibit 9 and said those were the chisels, hammer, and other tools turned over to him by the Tulsa Police Department.

Witness Broadrick testified on cross-examination that he arrived at the police station in Tulsa about 4 o'clock in the afternoon on March 12; that he parked his car about six or seven feet from the curb when he arrived at the court house in Ada with the three prisoners; that there was not any mud on the pavement from which defendants could have gotten mud on their feet.

On re-direct examination witness identified Exhibit 14 as the scrapings of paint taken from the safe of the Standard Food Market, and he stated that he sent these scrapings to the State Crime Laboratory.

The defendant called one witness in his own defense, Burl Oliver, superintendent of the street department, Ada, who said that he was familiar with the alley back of the Standard Food Market in the 500 block on East Main Street. He said that he laid part of the surface of the alley, but had not worked it for about a year; that it was a graveled alley; that about fifty per cent of the surface was gravel and was practically the same as put on most of the alleys of Ada.

On cross-examination witness said that on rainy days it was muddy in the alley back of the Standard Food Market.

█ This closed the evidence for the defendant; and the State rested. The defendant renewed his demurrer. From the evidence related, it is seen that there was ample evidence, if believed by the jury, to support the verdict rendered. The court did not err in overruling the demurrer to the evidence.

█ Counsel for defendant makes much of the fact that certain of the exhibits received by the State Crime Bureau in Oklahoma City for testing had been labeled "Various Articles taken from the Humpty-Dumpty Super Market, Ada, Oklahoma, which burned 3–12–58"; and that the coun-

ty attorney in his argument to the jury continued the error by referring to the burglarized building as the "Humpty-Dumpty Market", instead of the Standard Food Market. This error, in the opinion of this Court, could not have prejudiced the defendant. It was shown that the location of the burglarized and burned building was 520 East Main Street, Ada, and the evidence conclusively showed that it was the Standard Food Market that burned. In different towns chain food markets are not always known by standard names, and the error was harmless. The reference on the part of the county attorney in his argument to the jury did not constitute reversible error. Wallace v. State, 57 Okl.Cr. 50, 45 P.2d 164.

The judgment and verdict appealed from is affirmed.

NIX and BRETT, JJ., concur.