**William Dale DAVIS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–75–38.**

Court of Criminal Appeals of Oklahoma.

Sept. 17, 1975.

Rehearing Denied Nov. 25, 1975.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

## OPINION

PER CURIAM:

Appellant, William Dale Davis, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–74–1175, for the offense of Murder in the First Degree, in violation 21 O.S.Supp.

1974, § 701.1. His punishment was fixed at death, and from said judgment and sentence a timely appeal has been perfected to this Court.

The defendant was charged and tried jointly with Joney Joe Lusty, hereinafter referred to as defendant Lusty; however, the jury was unable to agree upon a verdict with respect to defendant Lusty, and for this same offense he was subsequently tried and convicted of Murder in the First Degree in an independent trial. See, *Lusty v. State*, Okl.Cr., 542 P.2d 545 (1975).

At the trial, the State's first witness, Kathryn Gadberry, testified that Raymond Martin was her brother. On the morning of March 30, 1974, at approximately 10:30 a. m. she went to her brother's apartment at 1219 N.W. 8th and found him dead on the kitchen floor. She identified State's Exhibit No. 1 as the watch her brother purchased at A.M.C., and State's Exhibit No. 2 as a knife that her sister had given to her brother, Raymond Martin.

The State's second witness, Barney Snythe of the Oklahoma City Police Department, testified that at approximately 10:30 a. m., March 30, 1974, he received a call to go to an apartment house located at 1219 N.W. 8th to investigate a possible homicide. Upon entering the manager's apartment he found a man lying in a pool of blood on the kitchen floor. His arms were extended back behind his head and he had dried blood encrusted on his face. His pockets were turned inside out and the left front pocket had an open safety pin stuck in it. He learned the victim's name was Raymond Martin. He identified State's Exhibit No. 5 as an accurate photograph of the man he found on the kitchen floor. At this point, State's Exhibit No. 5 was admitted into evidence, over objection by defense counsel.

The State's third witness, Kent Welsh, testified that he owned the apartment house at 1219 N.W. 8th, and that Raymond Martin was the manager of said apartment house. He identified State's Exhibit No. 6 as a key that appeared to be the key to the laundry room in the apartment house. He stated that Raymond Martin would have had that key in his possession.

The State's fourth witness, Jerry Lee Guinn of the Oklahoma City Police Department, testified that his investigation of the homicide at 1219 N.W. 8th included, in part, an interview of the defendant. The interview was conducted subsequent to the defendant being advised of his rights, which he indicated he understood. At this time, Detective Guinn identified defendant as the man he had interviewed. The questions put to, and the answers received from, the defendant were typed by a stenographer. Detective Guinn identified State's Exhibit No. 3 as the written statement given to him by the defendant and stated that he and Marilyn Scott, Notary Public, witnessed the defendant sign this statement. The statement was admitted, over objection, into evidence. Detective Guinn next identified State's Exhibit No. 7 as a hunting knife that the defendant told him he used to kill Martin. Pursuant to directions from the defendant, the knife was recovered in an alley between South 4th and 5th Streets. State's Exhibit No. 8 was identified as an accurate photograph of the knife as it was found partially buried in the alley. State's Exhibits No. 7 and No. 8 were then admitted into evidence, over objection by defense counsel. Next, Detective Guinn testified that defendant Lusty took him to his brother Leonard's house, where money taken from the victim was recovered. State's Exhibit No. 9, a One Hundred Dollar ($100) bill, and State's Exhibit No. 12, thirty-six (36) One Hundred Dollar ($100) bills, were admitted into evidence.

On cross-examination, Detective Guinn testified that during approximately the first hour of his interview with defendant, the defendant repeatedly denied having any knowledge of the crime. Defendant Lusty was then brought into the interrogation room to confront the defendant. Defendant Lusty was present during the interview

with defendant for approximately forty-five (45) minutes. Shortly before defendant Lusty was taken out of the room, the defendant confessed to killing Martin. Detective Guinn finally testified that he took a written statement from defendant Lusty on March 31, 1974, and that Officer Knight took a second written statement on April 1, 1974.

At this point in the trial, it was stipulated that if Dr. Tom Hewitt were present he would testify that he was the State Medical Examiner and that Raymond Martin had died of multiple stab wounds.

The State's fifth witness, Detective Claude Shobert of the Oklahoma City Police Department, identified State's Exhibit No. 1 as the watch he removed from defendant Lusty's pocket at 5:15 p.m. on March 30, 1974. State's Exhibit No. 1 was admitted into evidence, over objection of defense counsel.

The State's final witness, Officer Ron Chambers of the Oklahoma City Police Department, identified State's Exhibit No. 2 as the butcher knife he recovered as a result of defendant Lusty showing him where he had hidden it. It was retrieved from a driveway in the middle of the 800 block of North Ellison Street. State's Exhibit No. 2 was then admitted into evidence, over objection. Officer Chambers further testified that subsequent to advising defendant Lusty of his rights, he interviewed him in connection with the homicide of Raymond Martin on April 1, 1974. He identified State's Exhibit No. 4 as a signed statement he and his partner received from defendant Lusty on April 1, 1974. He stated that he, Officer Knight, his partner, and Kathy Wyman, the stenographer, witnessed defendant Lusty sign the written statement. State's Exhibit No. 4 was admitted into evidence.

On cross-examination, he identified defendant's Exhibit No. 1 as another written statement taken from defendant Lusty on March 31, 1974.

At this point, the trial court read to the jury, and for the record, State's Exhibits No. 3 and No. 4, the confessions of both defendants. The transcript of those proceedings is attached hereto as Appendix A and B, respectively. The State then rested its case.

Neither defendant elected to testify and neither offered evidence in his own behalf, except that defendant Lusty did offer his first confession of March 31, 1974, as defendant's Exhibit No. 1.

■■■ Defendant's first assignment of error alleges there was no corroboration of his confession. In *Moreno v. State*, Okl. Cr.. 504 P.2d 1241 (1972), this Court said:

". . . It has long been the law of this State that a confession not corroborated by independent proof of the corpus delicti, will not sustain a conviction. *Shires v. State*, 2 Okl.Cr. 89, 99 P. 1100 (1909). . . ."

Further, this Court held in *Drake v. State*, Okl.Cr., 437 P.2d 461 (1968), in the first paragraph of the Syllabus:

"It is not necessary that the corpus delicti should be proved beyond a reasonable doubt before other evidence may be introduced which corroborates it or strengthens reasonable inferences drawn therefrom. In the absence of other evidence that a crime has been committed it is improper in the trial of a homicide case to admit in evidence the confession of accused, but such confessions are properly admitted in conjuction with other evidence of the corpus delicti, as where there is evidence from which the jury might reasonably infer the commission of the offense charged, it being unnecessary to establish the corpus delicti beyond a reasonable doubt before evidence of the prisoner's confession can be admitted."

In the instant case, the State's evidence established that a dead body was found and that said body had marks of violence upon it indicating that the deceased came to his

death by violent means. Furthermore, when the evidence of the dead body is combined with the testimony of the medical examiner that the deceased died of multiple stab wounds [Tr. 244] and the testimony concerning the murder weapon [Tr. 203, 227], it becomes apparent that the corpus delicti was clearly established. Accordingly, we find there was sufficient independent evidence to corroborate defendant's confession.

Defendant further contends that the confession of co-defendant Lusty was inadmissible against him as it violated his constitutional right of confrontation. In support of this contention, defendant relies on the case of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which held that the admission at a joint trial of evidence of a co-defendant's extrajudicial confession implicating the defendant violated the defendant's constitutional right of confrontation. After a careful examination of the record, we cannot agree. Subsequent to *Bruton, supra*, the United States Supreme Court held, on no less than three occasions:

> "The mere finding of a violation of the Bruton rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."

*Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972). See also, *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), and *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

■ In the instant case, the confession of co-defendant Lusty, although erroneously admitted, was merely cumulative of other overwhelming and uncontradicted evidence properly before the jury. Furthermore, the allegedly inadmissible statement of Lusty at most tended to corroborate and was compatible with the details of defendant's comprehensive confession. In *Bruton, supra*, the Court indicated:

> "A defendant is entitled to a fair trial but not a perfect one."

Additionally, however, that Court held in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967):

> ". . . [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . ."

Applying the above standard, we conclude that the jury would not have found the State's case significantly less persuasive had Lusty's confession been excluded. The distinguishing factor here is that both defendants made substantially identical statements of their own guilt and neither, by their statements, stood in antagonistic positions at the trial as between themselves. We feel that this factor takes the case out of the purview of *Bruton, supra*, and makes an exception to the rule of that case because the turning factor involved is that the denial of the Sixth Amendment right to confrontation must result in some prejudice by reason of the admission of the confession into evidence. This Court does not see how the defendant can seriously contend that the statement of a co-defendant can prejudice one who has already admitted his participation in a criminal act. The admission of this statement, therefore, was at most, harmless error. See *Gregor v. State*, Okl.Cr., 505 P.2d 519 (1973).

■ Defendant also contends that the confession of co-defendant Lusty, his accomplice, was not corroborated as required by 22 O.S.1971, § 742. Again, we cannot agree. This Court stated in *Rider v. State*, Okl.Cr., 494 P.2d 347 (1972):

> "As to the adequacy of the corroborative evidence, this Court has held, that the corroborative evidence must of itself, and without the aid of the testimony of

the accomplice, tend in some degree to connect the defendant with the commission of the offense; and independent evidence merely consistent with the main story is not sufficient to corroborate if it requires any part of the accomplice's testimony to make it tend to connect the defendant with the crime. Such evidence need not of itself be sufficient to establish defendant's guilt, but there must be some evidence independent of the accomplice's testimony, which tends to connect the defendant with the offense committed. Further, the evidence independent of the testimony of the accomplice must tend to connect defendant with the crime itself, and not simply with its perpetrators. The corroborating evidence may be sufficient, although by itself slight, but it is not sufficient if it merely tends to raise a suspicion of guilt. *Kirk v. State,* 10 Okl.Cr. 281, 135 P. 1156 (1913). The accomplice's testimony need not be corroborated in detail, but testimony of accomplice must be corroborated by such other evidence of material parts of his testimony as will tend to connect the defendant with commission of the offense. *Sanders v. State*, Okl. Cr., 341 P.2d 643 (1959)."

██ We have no doubt that the evidence in the instant case meets the standards enunciated in *Rider, supra.* The defendant's own statement, which was properly admitted into evidence against him, supports in substantial measure the statement of the accomplice Lusty concerning the events leading up to the death of Raymond Martin, and constitutes sufficient independent evidence to connect the defendant with the commission of the offense. See, *Davis v. State*, Okl.Cr., 524 P.2d 46 (1974).

██ In his final assignment of error, the defendant contends that the death sentence is unconstitutional by virtue of the decision of the United States Supreme Court in the consolidated cases of *Furman v. Georgia, Jackson v. Georgia* and *Branch v. Texas,* 408 U.S. 238, 92 S.Ct.

2726, 33 L.Ed.2d 346 (1972). However, in this regard we need only observe that this contention was thoroughly analyzed and rejected by this Court in the consolidated opinion of *Williams and Justus v. State,* Okl.Cr., 542 P.2d 554 (1975).

The evidentiary hearing contemplated under the provisions of 21 O.S.Supp.1974, §§ 701.5 and 701.6 was previously assigned and heard by this Court. No evidence was offered by either the defendant or the State upon that hearing. Rather, shortly prior thereto, the defendant filed a motion requesting that this Court establish guidelines for the review of death sentences under those statutory provisions. As we have since held in our decision in *Williams and Justus v. State, supra,* that these provisions are unconstitutional, no further discussion thereof is necessary here.

Pursuant to Rule 1.11 of this Court, 22 O.S.Supp.1974, Chap. 18, App., this case was previously assigned and heard for oral argument. We have now carefully reviewed the entire record before this Court, and thoroughly considered the argument and authority presented, and have determined that the record is free of any error of law requiring reversal. The judgment and sentence is, accordingly, *affirmed.*

Pursuant to Rule 1.18, 22 O.S.Supp.1974, Chap. 18, App., the defendant is advised that any Petition for Rehearing herein must be filed with the Clerk of this Court within fifteen (15) days of the date upon which this Opinion is filed therein.

APPENDIX A .

"THE COURT: 'Voluntary Statement, 4-3-74. Place: Oklahoma City Police Department. Time: 12:05 p. m. Relative to: Homice [sic] of Raymond Martin. Occurring: 10:00 p. m. Date: 3-29-74. Place: 1219 Northwest 8th, Oklahoma City, Oklahoma.

I, the undersigned, William Dale Davis, of 1219 Northwest 8th, Oklahoma City, Oklahoma, being twenty years of age, born at Sioux City, Iowa, on April 27, 1953, do hereby make the following statement to

Sargeant [sic] Larry Upchurch and J. Guinn, they having first identified themselves as police officers, knowing that I may have an attorney in my behalf present and that I do not have to make any statement nor incriminate myself in any manner. I make this statement voluntarily, of my own free will, knowing that such statement could later be used against me in any court of law, and I declare that this statement is made without any threat, coercion, offer of benefit, favor or offer of favor, leniency or offer of leniency by any person or persons whomsoever, and that if I cannot afford an attorney, that one will be appointed by the court free of charge. I also understand that I may stop the questioning for the purpose of consulting an attorney.

QUESTION: Do you understand your rights as listed above?

ANSWER: Yes.

QUESTION: Are you willing to waive these rights and give a statement?

ANSWER: Yes.

QUESTION: Mr. Davis, did you previously live at 1219 Northwest 8th Apartment 9?

ANSWER: Yes.

QUESTION: Did you have a roommate at that apartment?

ANSWER: Yes.

QUESTION: What was the roommate's name?

ANSWER: Joney Joe Lusty.

QUESTION: Directing your attention to Friday evening, the date being 3–29–74, were you and Joney Lusty together at 1219 Northwest 8th, Apartment 9?

ANSWER: Yes.

QUESTION: Did you and Mr. Lusty have any conversation about the manager of the apartment and if so, what was that conversation?

ANSWER: Yes. I told Joney that we could rob the manager and I told him I was going to kill him. He didn't believe me and he went to sleep for awhile. When he woke up I asked him if he still wanted to rob him.

QUESTION: Did Joney Joe Lusty finally agree to go with you and rob the apartment manager?

ANSWER: Yes.

QUESTION: What time, if you can remember, did you and Joney Lusty go to the manager's apartment?

ANSWER: It was ten after nine.

QUESTION: Did you knock on the apartment manager's door?

ANSWER: Yes.

QUESTION: What happened when the apartment manager answered the door?

ANSWER: He opened the curtain on the door and he asked what we wanted. I told him we were going to pay some rent. Then he opened the door. We walked in and he was asking us if we wanted to move over to another room and split up. I told him that I was going to go ahead and pay my rent right then and then he started walking towards the kitchen and I pulled a knife and started stabbing him.

QUESTION: The first time you stabbed him, do you remember if it was in the back?

ANSWER: It was right on the right side.

I have read or have had read to me the foregoing statement consisting of five pages and the facts contained therein are true and correct. Signed by Willie Davis.

QUESTION: How many times do you remember stabbing Mr. Martin?

ANSWER: I don't really remember, I thought that it was about twenty times.

QUESTION: Did he fall to the corner in the kitchen after you stabbed him?

ANSWER: Yes.

QUESTION: Did you stab any more after he was on the floor?

ANSWER: Yes.

QUESTION: When you quit stabbing him, what did you do next?

ANSWER: I got up and started roaming through the drawers.

QUESTION: What were you looking for?

ANSWER: Money.

QUESTION: Did you find any money?

ANSWER: About forty to thirty-five dollars.

QUESTION: Where did you find that money?

ANSWER: In one of the kitchen drawers.

QUESTION: What was Joney Lusty doing while you were going through the drawers after you stabbed the man?

ANSWER: I believe he was in the bedroom doing something, don't know what.

QUESTION: Did you intend to kill the man when you went in?

ANSWER: Yes.

QUESTION: Why did you intend to kill him?

ANSWER: I was just pissed off.

QUESTION: Did you see Joney Lusty going through the dead man's pockets?

ANSWER: I can't remember. I ran out into the living room and he went back into the kitchen.

QUESTION: While you were in the apartment did you find a gun?

ANSWER: Yes.

QUESTION: Did you find the gun or did Joney find the gun and give it to you?

ANSWER: Joney found it and asked if I wanted it and I said yes.

QUESTION: Did you take the gun?

ANSWER: Yes.

QUESTION: Is this the same gun that you had in your possession when you were arrested?

ANSWER: Yes.

QUESTION: Who did the knife belong to that you used to stab the man?

ANSWER: I found it, it was mine.

QUESTION: Did Joney know that you intended to kill the man when you went in to rob him?

ANSWER: I told him, but he didn't believe me.

QUESTION: The knife that you used to stab the man, would you describe that knife to us?

ANSWER: It was a brown handled Bowie knife with about a 5½ inch blade.

QUESTION: Was this the same knife that you took Sargeant [sic] Upchurch and Detective Guinn to an alley between Broadway and Robinson, between Southwest 4th and Southwest 5th, and discovered the knife buried in the ground at that location?

ANSWER: Yes.

QUESTION: Would you describe how you buried the knife?

ANSWER: I stuck the blade in first and then stamped it in the ground with my foot.

I have read or had had [sic] read to me the foregoing statement consisting of five pages and the facts contained therein are true and correct. Willie Davis's signature.

QUESTION: Willie, will you describe, if you can remember, the kind of clothing the victim was wearing when you stabbed him?

ANSWER: He was wearing some dark colored slacks and a green shirt.

QUESTION: Do you recall what color belt he had on?

ANSWER: No.

QUESTION: What kind of clothing were you wearing at the time?

ANSWER: Orange colored slacks and I can't remember what color the shirt was.

QUESTION: What kind of shoes were you wearing at the time?

ANSWER: Working boots.

QUESTION: Did the boots have any kind of a pattern on the soles?

■

ANSWER: They were pretty worn out, but they had little square deals on them.

QUESTION: Did you take anything with you in the man's apartment to use to wipe up fingerprints?

ANSWER: A pair of shorts. I wiped some blood up off the floor.

QUESTION: Did you get blood on your clothing when you stabbed the man?

ANSWER: Yeah, I got a little bit.

QUESTION: Did you use a white towel to wipe up any blood or clean the blood off yourself?

ANSWER: I can't remember if I used a towel.

QUESTION: Willie, after you and Joney left the manager's apartment, did you go back to your room?

ANSWER: Yes.

QUESTION: What did you do then?

ANSWER: I got a change of clothes and put the clothes that I was wearing in a box with some stuff out of the apartment and threw them away.

QUESTION: Did you and Joney take everything out of your room and move out at that time?

ANSWER: Yes.

QUESTION: Did you throw anything away in the trash cans behind your apartment at that time?

ANSWER: Yes.

QUESTION: Do you remember what you threw away there?

ANSWER: There were just papers and junk that we had in the apartment.

QUESTION: Before you left the manager's apartment did you pick up a butcher knife that came out of the apartment and give it to Joney?

ANSWER: Yes.

QUESTION: After you and Joney left the apartment what did you do then?

ANSWER: We ran down and threw part of the clothes in some trash cans.

QUESTION: Was the trash can a large dempsey dumpster type?

ANSWER: That was one of them.

QUESTION: Did you throw clothing in another trash can besides that one?

ANSWER: A little trash can.

QUESTION: What did you throw in the small trash can?

ANSWER: Part of the bloody clothes.

QUESTION: Did you and Joney split up any money that came out of the man's room?

ANSWER: Yes.

QUESTION: How much did you get for your share?

ANSWER: I got about thirty dollars.

I have read or have had read to me the foregoing statement consisting of five pages and the facts contained therein are true and correct. Willie Davis's signature.

QUESTION: Did you get any change out of the man's apartment?

ANSWER: Yes.

QUESTION: Where did you get the change at in the apartment?

ANSWER: I believe it was in a drawer.

QUESTION: What denomination was the change in?

ANSWER: Quarters and dimes.

QUESTION: Did you notice if any of the quarters and dimes had green or blue paint on them?

ANSWER: I saw one dime that had some blue paint.

QUESTION: Did you see the man's billfold?

ANSWER: Yes.

QUESTION: Do you remember what color it was?

ANSWER: Black.

QUESTION: Do you know what happened to the man's billfold?

ANSWER: It got thrown away somewhere.

QUESTION: Did you throw it away or did Joney throw it away?

ANSWER: I'm not sure, but I think I did.

QUESTION: Did you and Joney split up after you left the apartment?

ANSWER: Yes.

QUESTION: What did you do then?

ANSWER: I hid the knife and went and got a bus ticket to Sioux City, Iowa. I went to Iowa and came back.

QUESTION: Did you see anybody or talk to anybody in Sioux City, Iowa?

ANSWER: No.

QUESTION: Did you dispose of anything that belonged to you while you were on that trip?

ANSWER: I threw a pair of working boots away.

QUESTION: Was these the boots you were wearing at the time of the killing?

ANSWER: Yes.

QUESTION: What town were you in when you threw the boots away?

ANSWER: Joplin, Missouri.

QUESTION: Did you buy any other kind of shoes in that town?

ANSWER: Yes.

QUESTION: What kind of shoes did you buy?

ANSWER: Some tennis shoes.

QUESTION: Were these the shoes you were wearing when you were arrested?

ANSWER: Yes.

QUESTION: What did you do when you came back from Iowa on the bus?

ANSWER: I went to Midwest City and got on this church bus.

QUESTION: Did anyone approach you while you were on the church bus?

ANSWER: Yes.

QUESTION: Who was that, if you know?

ANSWER: I found out that he was a preacher.

QUESTION: Were you at the preacher's house when you decided to call the police and turn yourself in?

ANSWER: Yes.

QUESTION: Did you make the call to the police or did you have the preacher make the call?

ANSWER: The preacher.

I have read or have had read to me the foregoing statement consisting of five pages and the facts contained therein are true and correct. Willie Davis's signature.

QUESTION: When did you learn that the police were looking for you in reference to the murder?

ANSWER: Sunday.

QUESTION: How did you learn that?

ANSWER: A newspaper.

QUESTION: Willie, have you told the entire truth in this statement?

ANSWER: Yes.

QUESTION: Did you make this statement voluntarily of your own free will?

ANSWER: Yes.

QUESTION: What kind of education do you have?

ANSWER: I graduated from the twelth [sic] grade.

QUESTION: Do you have any kind of mental problem that you know of?

ANSWER: No.

QUESTION: Have any threats or promises of any kind been made to you in reference to making this statement?

ANSWER: No.

QUESTION: Are you aware that you are charged with Murder in the First Degree?

ANSWER: Yes.

QUESTION: Are you aware of the penalty that this charge carries on conviction?

ANSWER: Yes.

QUESTION: What is the penalty for Murder in the First Degree in Oklahoma?

ANSWER: The death penalty.

QUESTION: Were you advised of your rights to have a lawyer present during this statement prior to making this statement?

ANSWER: Yes.

QUESTION: Did you waive your rights to a lawyer?

ANSWER: Yes.

QUESTION: Willie, do you have anything else that you would like to add to this statement at this time?

ANSWER: I did the killing and Joney Joe Lusty didn't have anything to do with that.

QUESTION: But Joney Lusty was with you at the time and took some of the money from the manager's apartment, is that correct?

ANSWER: Yes.

I have read or have had read to me the foregoing statement consisting of five pages and the facts contained therein are true and correct.'

Signed by Willie Davis, and there are three witnesses' signatures and the Notary Public."

## APPENDIX B

"THE COURT: Again, this statement, Exhibit Four has been admitted in evidence and I will now read it.

'4-1-74, Oklahoma City Police Department, 6:40 p. m. Relative to the homicide of Raymond Martin, occurring at 10:00 p. m., 3-29-74, 1219 Northwest 8th, manager's apartment, Oklahoma City.

I, the undersigned, Joney Joe Lusty, of 1219 Northwest 8th, Number Nine, Oklahoma City, Oklahoma, being twenty years of age, born at Oklahoma City, Oklahoma, on 10-26-53, do hereby make the following statement to Detective Knight and Detective Chambers, they having first identified themselves as police officers, knowing that I may have an attorney in my behalf present and that I do not have to make any statement nor incriminate myself in any manner. I make this statement voluntarily, of my own free will, knowing that such statement could later be used against me in any court of law, and I declare that this statement is made without any threat, coercion, offer of benefit, favor or offer of favor, leniency or offer of leniency by any person or persons whomsoever, and that if I cannot afford an attorney, that one will be appointed by the court free of charge. I also understand that I may stop answering questions at any time that I desire, or stop the questioning for the purpose of consulting an attorney.

Do you understand your rights as listed above?

ANSWER: Yes.

Are you willing to waive these rights and give a statement? ANSWER: Yes.

QUESTION: Mr. Lusty, did you give a previous voluntary statement in regards to the above homicide to Detective Guinn on March 31, 1974, at about 1:30 p. m.?

ANSWER: Yes, but not a full statement.

QUESTION: Mr. Lusty, at approximately 5:00 p. m. on April 1, 1974, did you state to these officers (Knight and Chambers) that you wish to give a full and complete statement as to what had transpired from the afternoon of March 29, 1974, to the early morning hours of March 30, 1974?

ANSWER: Yes.

QUESTION: Mr. Lusty, how much education do you have?

ANSWER: I went to the 10th grade.

QUESTION: Mr. Lusty, can you read and write?

ANSWER: Just a little bit, very little.

QUESTION: Mr. Lusty, I'm going to ask you to relate to us your activities starting at approximately 5:00 p. m. on 3–29–74, when you and Willie Davis, who was your roommate at the time, were sitting in your room at 1219 Northwest 8th, Apartment Number Nine.

ANSWER: Me and Willie was sitting in the room talking, his first subject was why don't we rob the manager, that he wanted to rob the manager. I told him no that it wouldn't be worth it. So I told him I was going to move. So I packed my clothes up. Willie helped me take my clothes to a mission on Southwest 5th, then we came back to the room. About 6:30 Willie brought up the subject again about robbing the manager. He said it would be easy. I told him that it wouldn't. He said that the manager carried a lot of money on him all the time. He told me he had seen the manager with a lot of money some time ago. I told him that I would think about it and dozed off and went to sleep. When I woke back up the time was 10:00 p. m. Willie asked me again if I wanted to go through with the robbery. So I told him O. K. Me and Willie knocked on the manager's door. The manager looked outside the window. I had told the manager that we come to pay the rent. He let us in and as we was walking I was beside the manager—

I have read or have had read to me the foregoing statement consisting of three pages and the facts contained therein are true and correct. Joney Joe Lusty's signature.

—and Willie was behind the manager. As we got halfway through the kitchen Willie stabbed him in the back and stabbed him again. Willie had his arm around the manager's neck and kept stabbing him and he staggered to the kitchen and then fell on the floor on his back and he stabbed him again in the stomach and on the side and up in the chest and I got up and closed the curtain and turned on the light. I looked in the drawer and Willie was doing the same. Then we went in the living room, looked in the bookcase bed, and found a .22 pistol. I handed it to Willie, the [sic] I went to look in the drawers in the bedroom. Came back out, back in the kitchen I found a watch and some keys. I got a towel and wiped up the blood on the floor. Willie had picked up a knife, a butcher knife, and handed it to me. Then we went back to the living room, no that's wrong, we was in the kitchen, then I took the man's billford [sic] out of his back pocket, took another one out of the front pocket and went through the drawers in the kitchen, we didn't find anything else. Walked back in the living room found a jar of quarters and dimes on the television. We took the money out of the jar and left the jar there. After that we went up toward the door to see if anybody was coming, went back to our room and I pulled out some small bills and laid it on the bed and Willie said to go ahead and split it some where else. We changed clothes in our room. Willie picked up a box that had our old clothes in there and white towel that I had, I put it in the trash can. I took the trash can out in the back, that had the white towel in it. I walked down the road about a half a block and hide the butcher knife. As I was coming back towards the apartment Willie was coming out with a big box. We went down the road towards the alley and I took out the shirt and pants that I had on out of the box and we went on down the alley. I walked faster than Willie did and he came about half a block behind me. We went up towards 7th Street, that would be heading east, we went to behind a building somewhere and threw the box away. We walked south where my old apartment used to be at and there I took out the money and gave it to Willie, then he split it with me. From there we went back to SW 2nd

Street by South Lee where he went south and I kept on walking on SW 2nd. I then took the little black coin purse by the corner light and opened it up, took the change out of there, put the black pocketbook in my pocket. I then took out the other billfold that I had taken from the manager and opened it up. There was some money in there, I don't know how much. I took the money out of it and put it in my left shirt pocket. I went on down towards Walker on 1st Street and tossed it away. I went back north to a bar, made a telephone call, called a taxi, have him come after me to go to SE 18th and from there that was where I was at until about 3:00 in the morning.

QUESTION: Joney, while you were sitting in your apartment with Willie at about 5:00, were you or Willie drinking or sniffing any paint or glue?

ANSWER: No.

QUESTION: Joney, had you and Willie been drinking that day?

ANSWER: I had been drinking earlier that day, I had drank a six pack about noon.

QUESTION: Joney, did the manager, Mr. Martin, yell or say anything when Willie started stabbing him?

ANSWER: He just mumbled.

QUESTION: Joney, you stated that you was going to move from the apartment, was it because you were having arguments with Willie or were you just going to move out?

ANSWER: I was going to move out because the rent was up Saturday.

I have read or have had read to me the foregoing statement consisting of three pages and the facts contained herein are true and correct. Joney Joe Lusty's signature.

QUESTION: Joney, did you see Willie with any type of knife on him before you and Willie went to the apartment of the manager?

ANSWER: Yes.

QUESTION: Joney, would you describe this knife?

ANSWER: The handle was black and the blade was about five and a half inches long. It was a hunting knife type, that the blade does not fold up.

QUESTION: Joney, where did Willie carry that knife that you just mentioned before?

ANSWER: Well, he usually carried it in his back pocket.

QUESTION: Joney, when you and Willie were walking to the door of the manager's apartment did you see Willie carrying the above mentioned knife?

ANSWER: Yes.

QUESTION: Joney, what hand was he carrying it in?

ANSWER: The right hand.

QUESTION: Joney, you mentioned two billfolds and one black coin purse, would you tell me out of which pocket you took each billfold and purse?

ANSWER: The billfold was in the back in the right pocket and the coin purse was in the drawer. There was not a third billfold. The large amount of money was in his left pants pocket with a safety pin and a white piece of paper with some writing on it.

QUESTION: Joney, about how much money was in the billfold that you took out of the back pants pocket of the manager?

ANSWER: Less than $100.00.

QUESTION: Joney, is this the money that you and Willie split?

ANSWER: Yes.

QUESTION: Joney, did you take anything else off of the victim, Mr. Martin?

ANSWER: I didn't take anything else off of the manager, but I did take a small pocket knife with a yellow handle off the

kitchen table, and some keys, and that watch, being Bulova, with black leather band, with kind of a small face.

QUESTION: Joney, is there anything else that you would like to add to this statement?

ANSWER: Yes. Willie told me when we got back to the room that he had stabbed himself in the leg while he was stabbing the man, and that's about all.

I have read or have had read to me the foregoing statement consisting of three pages and the facts contained therein are true and correct.' Signed 'Joney Joe Lusty' and there are three witnesses."

## ORDER ON REHEARING

Appellant was heretofore sentenced to suffer death for the offense of First Degree Murder in Case No. CRF–74–1175 of the District Court, Oklahoma County, and upon appeal that sentence was thereafter affirmed in the above entitled cause. This Court then stayed the issuance of Mandate herein, upon its own motion, pending a resolution of related issues raised in the Petition for Rehearing in *Williams and Justus v. State*, Okl.Cr., 542 P.2d 554, F–74–648 and F–74–650 (1975), and oral argument was thereafter presented upon consolidated hearing. For the reasons discussed in our Opinion on Rehearing in *Williams and Justus,* the decision previously rendered herein is hereby *reaffirmed.*

It is therefore ordered, adjudged and decreed that the Order of this Court staying execution of sentence herein pending appeal be dissolved, and the Order of this Court staying issuance of Mandate is hereby superseded, and the Clerk of this Court is directed to issue Mandate *forthwith.*

It is further ordered, adjudged and decreed that the judgment and sentence herein appealed from be carried out by the electrocution of Appellant, William Dale Davis, by the Warden of the State Penitentiary at McAlester, Oklahoma, on Monday, February 23, 1976.