Dorothy Delaine WAMPLER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-75-588.

Court of Criminal Appeals of Oklahoma.

Aug. 9, 1976.

Rehearing Denied Aug. 27, 1976.

Burke Mordy, Mordy & Clark, Ardmore, for appellant.

## OPINION

BLISS, Judge:

Appellant, Dorothy Delaine Wampler, hereinafter referred to as defendant Wampler, was charged, tried and convicted in the District Court, Marshall County, Case No. CRF–74–76, for the offense of Murder in the Second Degree, in violation of 21 O.S.Supp.1973, § 701.2. Her punishment was fixed at not less than twenty-five (25) years, nor more than seventy-five (75) years under the direction and control of the State Department of Corrections, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial the following facts were developed. Commencing about June of 1974, and continuing up until the day before the murder, September 20, 1974, the defendant had been experiencing considerable marital problems with the deceased, Mr. Wampler. This fact had been expressed to a number of defendant's close friends, and in particular defendant had confided in co-defendant Maxwell as to the circumstances of her marital problems. The evidence tends to establish the fact that deceased had on occasion struck the defendant and he had threatened to kill both the defendant and co-defendant Maxwell if he ever caught them out together. Further, it was established that defendant worked at the Family Store at Wampler's Corner from 6:30 a. m. to approximately 9:00 or 9:30 p. m., seven days a week. Though there is conflicting testimony as to the number of times defendant had discussed the $300,000.00 life insurance policy with co-defendant Maxwell, it is established that at least on one occasion co-defendant Cantrell overheard such a conversation between the defendant and co-defendant Maxwell. Subsequently co-defendant Maxwell and co-defendant Cantrell had discussed the fact that such a policy did exist on the life of the deceased. Further, there was testimony to the effect that defendant had offered to pay $150,000.-

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Harold T. Garvin, Jr., Legal Intern, for appellee.

00 to have her husband killed. The evidence tends to establish that two weeks prior to the day of the murder the deceased had threatened to kill defendant and her children if she failed to produce a supposed lover. However, there is no evidence which tends to show that such a lover existed. On the other hand, it is clear from the evidence adduced at trial that the deceased did at times spend considerable time with a woman who had given birth to two children fathered by the deceased. Apparently, the deadline for the two week ultimatum was to be September 20, 1974.

The evidence adduced at trial established the following facts concerning the chain of events leading up to the murder. These events transpired between 4:00 p. m., September 20, 1974, and 12:45 a. m., September 21, 1974. At approximately 4:00 p. m., September 20, 1974, co-defendant Maxwell and co-defendant Cantrell were at Sue Martin's house when they received a phone call from defendant's daughter, Teresa Knox. In response thereto, they both drove to defendant's store, at Wampler's Corner. Subsequent thereto, the defendant, co-defendant Maxwell and co-defendant Cantrell engaged in conversation to the effect that Mr. Wampler had to be killed, and that if he were killed on company property, a $300,000.00 life insurance policy would be collected by defendant. A plan was then devised whereby co-defendant Cantrell and Bobby McBeth were to go down to Mr. Wampler's office, at the Pure Oil Company, break into it, and make it look like a burglary. Mr. Wampler was to be sent down there and upon arrival he would be shot and killed. However, there is some contradiction in the testimony as to the foregoing plan. At approximately 6:00 p. m. defendant's children left to attend a football game. Shortly thereafter co-defendant Cantrell left the Wampler Store and drove to Sue Martin's house where he picked up Mr. McBeth. Thereafter, the two of them drove to the Pure Oil Company Office, which is only a short distance from the Wampler store. There, they broke into the office, broke out the windows, pulled the files off the desk, shot out the lights and upon seeing an automobile approaching from down the road they got scared and drove back to the defendant's house. Mr. McBeth commenced to tell defendant and co-defendant Maxwell what they had done at the oil company office. At that time, another automobile was observed approaching defendant's house, therefore all four persons present at the house got into two different cars, and drove to Sue Martin's house. They arrived there at approximately 9:30 p. m. Subsequent thereto, they all four got into one car and drove to the football field, where co-defendant Cantrell told defendant's children that they were to spend the night at Sue Martin's house. They then returned to Sue Martin's house where they stayed until approximately 10:30. Thereafter, the defendant, co-defendant Cantrell, co-defendant Maxwell and Mr. McBeth all drove to co-defendant's home. They knew that Mr. Wampler would come out there looking for the defendant. They arrived there at approximately 11:00 p. m. and from that time until about 12:45 a. m., they discussed what would take place when Mr. Wampler arrived. At approximately 12:45 a. m. co-defendant Maxwell saw a vehicle approaching her home and notified the other three persons that Mr. Wampler was coming. Mr. McBeth went to the bedroom and took up a position behind the bed. Co-defendant Cantrell assumed a position behind the sewing machine directly in line with the front door. Defendant and co-defendant Maxwell hid in the bathroom. Co-defendant Cantrell had a .12 gauge shotgun and Mr. McBeth had a .16 gauge shotgun. The evidence tends to show that Mr. Wampler either stepped very hard or jumped onto the front porch and began to pound on the door. There is conflict in the testimony as to whether or not Mr. Wampler said anything before entering. The door was forced open and co-defendant Cantrell shot Mr. Wampler as he stepped inside the house. After being shot Mr.

Wampler fell backward so that the upper portion of his body was outside the door with his hips down being inside the door. The body was pulled back inside the house so that the front door could be closed. Thereafter, defendant came out of the bathroom and observed the body lying in the front room face down. Subsequent thereto, a plan was devised wherein defendant would obtain a .38 caliber revolver which would be placed in the deceased's hand so as to make it appear as though he were shot in self-defense. The defendant and Mr. McBeth drove to the Wampler store and recovered the revolver from underneath the cash register where it was kept for protection at the store. Upon return to the scene of the murder, co-defendant Maxwell fired the weapon into the back door. The defendant then helped Mr. McBeth place the deceased's fingerprints on the weapon, and then the weapon was dropped on the floor next to the body.

A self-defense story was devised whereby all four agreed to tell the same story. According to the plan defendant and co-defendant Maxwell were supposed to be spending the night at co-defendant Maxwell's home, because defendant was afraid to go home. Mr. Wampler came there looking for her. He supposedly beat on the door, called defendant a name, and threatened to kill defendant and anyone else in there with her. He forced the door open, fired a shot, missed and was shot. Mr. McBeth and co-defendant Cantrell were not supposed to be at the scene of the crime at all. Thereafter, all four got into co-defendant Maxwell's car and drove to Madill. Co-defendant Cantrell and Mr. McBeth were let out of the car near the edge of town, the defendant and co-defendant Maxwell proceeded to the City Hall where co-defendant Maxwell went in crying and stated that she had shot Mr. Wampler. The officers placed both the defendant and co-defendant Maxwell in their patrol car and drove to the scene of the crime. Thereafter, they were both driven to Sue Martin's house, and then to the hospital where defendant was sedated. Shortly after defendant had been admitted to the hospital, Bobby McBeth broke down and told Sue Martin the entire story as to how the murder had actually occurred.

Sheriff Splawn testified as to the facts surrounding the scene of the crime. He further testified as to the investigation of a reported burglary of the Pure Oil Company office. His testimony concerning the details of these two investigations substantiated the testimony of McBeth, codefendant Cantrell, and co-defendant Maxwell. Further, Sheriff Splawn's testimony and the testimony of other expert witnesses established a number of facts concerning physical occurrences which are inconsistent with the defendant's version of the shooting.

The defendant brings three assignments of error, the first one being that the trial court erred in overruling defendant's motion for a continuance. The motion was interposed when co-defendant Maxwell entered a plea of guilty on the first day of trial, and became a witness for the State against defendant. The defendant contends that this sudden change in posture of co-defendant Maxwell constituted sufficient surprise to warrant a continuance. Consequently, defendant contends that the refusal to grant the continuance was an abuse of discretion by the trial court.

It is elementary that motions for continuance are addressed to the sound discretion of the trial judge and rulings thereon will not be disturbed on appeal unless a clear abuse of that discretion is readily apparent. *Brown v. State*, Okl.Cr., 456 P.2d 604, 605 (1969). Whether the ruling of the trial court on the motion for continuance is within the proper exercise of its sound discretion usually depends on the facts of the particular case. Before ruling on a motion for continuance, the court must consider the grounds on which the application is made in light of the circumstances of the case. In the present case defendant claims she was surprised at trial and prejudiced

thereby. However, it is essential that an applicant for a motion for continuance be genuinely surprised. The facts of the present case clearly indicate the defendant was fully aware of co-defendant Maxwell's decision to change her plea and testify for the State three days prior to the time she took the witness stand. During those three days nothing appears of record which would indicate that defendant's position would be changed by co-defendant Maxwell's decision to testify. It is well settled that a co-defendant may withdraw a plea of not guilty and/or decide to testify on behalf of the State at any time and defendant is deemed to be on notice of that fact. *Paschall v. State*, 96 Okl.Cr. 198, 252 P.2d 175 (1952), *Rider v. State*, Okl.Cr., 494 P. 2d 347, 351 (1972). Further, after reviewing the entire record we fail to find any showing that additional evidence existed or could have been found; nor is there any showing that the results of the case would possibly be affected by the failure to grant a continuance. Therefore, we conclude that defendant's first assignment of error is without merit.

In her second assignment of error defendant asserts that the trial court erred in overruling the demurrer to the evidence. Defendant argues that the testimony of co-defendant Maxwell and that of accomplice McBeth were not sufficiently corroborated as required by 22 O.S.1971, § 742, which states that:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

It is uncontested in the instant case that co-defendant Maxwell and Mr. McBeth were admitted accomplices in the crime for which defendant is charged. Therefore, we need only determine whether or not the testimony of co-defendant Maxwell and accomplice McBeth were sufficiently corrob-

orated. This Court has held in numerous prior decisions that evidence necessary to corroborate an accomplice's testimony need not be such as to connect the accused directly with the commission of the crime. Rather, we hold that if the testimony of an accomplice is corroborated in one material fact by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer he speaks the truth as to all. *Nation v. State,* Okl.Cr., 478 P.2d 974 (1971), and *Brown v. State,* Okl.Cr., 518 P.2d 898 (1974). Further, the accomplice's testimony may be corroborated by circumstantial evidence. *Sizemore v. State,* Okl.Cr., 507 P.2d 1330 (1973), and *Brown v. State,* supra. In addition, we held in the fourth paragraph to the Syllabus in *Sanders v. State,* Okl.Cr., 341 P.2d 643 (1959), that:

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, Court of Criminal Appeals will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

Also see, *Sperry v. State,* Okl.Cr., 543 P.2d 582 (1975) and *Sizemore v. State,* supra.

In the instant case, the evidence adduced at trial placed defendant with the two co-defendants and Mr. McBeth on the evening of the murder. Specifically, this fact is corroborated by the testimony of Joe Blalock, Sue Martin, Teresa Knox, and Dennis Knox. Sheriff Splawn corroborated the fact of the oil company break-in and details of the scene of the crime. By defendant's own testimony she placed herself in the company of the three co-conspirators throughout the evening of the murder. Further, she admits knowledge of the oil company burglary, she placed herself at the scene of the crime, and she failed to take any action toward preventing the carrying out of the shooting. Further, defendant admits that she assumed an af-

firmative role in the attempted self-defense and coverup story. We have carefully reviewed the voluminous record of this case. Based thereon, we find not only sufficient circumstantial evidence which tends to connect defendant to this crime, but in addition defendant's own testimony sufficiently corroborates the testimony of co-defendant Maxwell and Mr. McBeth. It has long been held by this Court that the corroboration of an accomplice necessary to justify a conviction may be found in a defendant's testimony as well as in testimony of other witnesses. *Brewer v. State,* 63 Okl.Cr. 389, 75 P.2d 901 (1938), and *Parrott v. State,* Okl.Cr., 522 P.2d 628, 633 (1974). Also, the sufficiency of the corroboration is to be determined by all the evidence in the case, not just the State's evidence in chief. See, *Smith v. State,* Okl.Cr., 509 P. 2d 1391 (1973).

In line with these cases, it is clear that the accomplices' testimony was corroborated by sufficient evidence to connect defendant with the crime. Therefore, we find defendant's second assignment of error to be without merit.

 Defendant's final assignment of error is that the sentence is excessive and contrary to law. The trial judge sentenced defendant to an indeterminate sentence of not less than twenty-five (25) years, nor more than seventy-five (75) years in the State penitentiary in accordance with 21 O.S.Supp.1975, § 701.4. That title states:

"Every person convicted of murder in the second degree shall be punished by imprisonment in the State Penitentiary for not less than 10 (10) years nor more than life. The trial court shall set an indeterminate sentence in accordance with this section upon a finding of guilty by the jury of murder in the second degree."

Recently, in *Smith v. State,* Okl.Cr., 550 P.2d 946 (1976), this Court was called on to add clarity to what was certainly an ambiguous statute. The first provision in this Statute is clear and that is that "every person convicted of murder in the second degree shall be punished by imprisonment in the State Penitentiary for not less than 10 (10) years nor more than life." However, the ambiguity occurs upon reading the second provision that, "the trial court shall set an indeterminate sentence in accordance with this section upon a finding of guilty by the jury of murder in the second degree." As we held in the *Smith* case, "We are of the opinion that the second provision is mere surplusage in regard to the sentence to be imposed upon the finding of guilty of murder in the second degree. Consequently, any ambiguity regarding the particular sentence to be imposed under this section is resolved and the provisions mandate that the only sentence which the trial court may impose is an indeterminate sentence of ten (10) years to life imprisonment, as opposed to a fixed period of years."

It is now settled that the trial court shall not have discretion in setting a sentence for any period within the minimum or maximum set by 21 O.S.Supp.1975, § 701.4. Rather, the sentence upon a conviction of murder in the second degree shall in all cases be an indeterminate sentence of ten (10) years to life.

The sentence in the instant case does not comply with the provisions of 21 O.S. Supp.1975, § 701.4, as interpreted herein. Therefore, the cause is REMANDED to the District Court, Marshall County, with instructions to the trial court to resentence the defendant, as herein provided on the verdict the jury returned in this case. For the foregoing reasons the judgment and sentence appealed from is, in all other respects, *AFFIRMED.*

BRETT, P. J. and BUSSEY, J., concur.