# ROBERTS *v.* LOUISIANA

No. 75–5844.   Argued March 30–31, 1976—Decided July 2, 1976

326

*Anthony G. Amsterdam* argued the cause for petitioner. With him on the brief were *Jack Greenberg, James M. Nabrit III, Peggy C. Davis, James E. Williams,* and *Richard P. Ieyoub.*

*James L. Babin* argued the cause for respondent. With him on the brief were *William J. Guste, Jr.,* Attorney General of Louisiana, *Walter L. Smith* and *L. J. Hymel, Jr.,* Assistant Attorneys General, and *Frank T. Salter, Jr.*

*Solicitor General Bork* argued the cause for the United States as *amicus curiae.* With him on the brief was *Deputy Solicitor General Randolph. William E. James,* Assistant Attorney General, argued the cause for the State of California as *amicus curiae.* With him on the

brief were *Evelle J. Younger,* Attorney General, and *Jack R. Winkler,* Chief Assistant Attorney General.*

Judgment of the Court, and opinion of MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS, announced by MR. JUSTICE STEVENS.

The question in this case is whether the imposition of the sentence of death for the crime of first-degree murder under the law of Louisiana violates the Eighth and Fourteenth Amendments.

I

On August 18, 1973, in the early hours of the morning, Richard G. Lowe was found dead in the office of the Lake Charles, La., gas station where he worked. He had been shot four times in the head. Four men—the petitioner, Huey Cormier, Everett Walls, and Calvin Arceneaux—were arrested for complicity in the murder. The petitioner was subsequently indicted by a grand jury on a presentment that he "[d]id unlawfully with the specific intent to kill or to inflict great bodily harm, while engaged in the armed robbery of Richard G. Lowe, commit first degree murder by killing one Richard G. Lowe, in violation of Section One (1) of LSA–R. S. 14:30."

At the petitioner's trial, Cormier, Walls, and Arceneaux testified for the prosecution. Their testimony established that just before midnight on August 17, the petitioner discussed with Walls and Cormier the subject of "ripping off that old man at the station," and that on the early morning of August 18, Arceneaux and the petitioner went to the gas station on the pretext of seeking employment. After Lowe told them that there were no jobs available they surreptitiously made their way into

---

*\*Arthur M. Michaelson* filed a brief for Amnesty International as *amicus curiae.*

the office of the station, where Arceneaux removed a pistol from a desk drawer. The petitioner insisted on taking possession of the pistol. When Lowe returned to the office, the petitioner and Arceneaux assaulted him and then shoved him into a small back room. Shortly thereafter a car drove up. Arceneaux went out and, posing as the station attendant, sold the motorist about three dollars' worth of gasoline. While still out in front, Arceneaux heard four shots from inside the station. He went back inside and found the petitioner gone and Lowe lying bleeding on the floor. Arceneaux grabbed some empty "money bags" and ran.

The jury found the petitioner guilty as charged. As required by state law, the trial judge sentenced him to death. The Supreme Court of Louisiana affirmed the judgment. 319 So. 2d 317 (1975). We granted certiorari, 423 U. S. 1082 (1976), to consider whether the imposition of the death penalty in this case violates the Eighth and Fourteenth Amendments of the United States Constitution.

## II

The Louisiana Legislature in 1973 amended the state statutes relating to murder and the death penalty in apparent response to this Court's decision in *Furman* v. *Georgia,* 408 U. S. 238 (1972). Before these amendments, Louisiana law defined the crime of "murder" as the killing of a human being by an offender with a specific intent to kill or to inflict great bodily harm, or by an offender engaged in the perpetration or attempted perpetration of certain serious felonies, even without an intent to kill.[1] The jury was free to return any of four ver-

---

[1] La. Rev. Stat. Ann. § 14:30 (1951). The felonies were aggravated arson, aggravated burglary, aggravated kidnaping, aggravated rape, armed robbery, and simple robbery.

dicts: guilty, guilty without capital punishment, guilty of manslaughter, or not guilty.[2]

In the 1973 amendments, the legislature changed this discretionary statute to a wholly mandatory one, requiring that the death penalty be imposed whenever the jury finds the defendant guilty of the newly defined crime of first-degree murder. The revised statute, under which the petitioner was charged, convicted, and sentenced, provides in part that first-degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm *and* is engaged in the perpetration or attempted perpetration of aggravated kidnaping, aggravated rape, or armed robbery.[3] In a

---

[2] La. Code Crim. Proc. Ann., Art. 814 (1967).

[3] La. Rev. Stat. Ann. § 14:30 (1974):

*"First degree murder*

"First degree murder is the killing of a human being:

"(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated rape or armed robbery; or

"(2) When the offender has a specific intent to kill, or to inflict great bodily harm upon, a fireman or a peace officer who was engaged in the performance of his lawful duties; or

"(3) Where the offender has a specific intent to kill or to inflict great bodily harm and has previously been convicted of an unrelated murder or is serving a life sentence; or

"(4) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; [or]

"(5) When the offender has specific intent to commit murder and has been offered or has received anything of value for committing the murder.

"For the purposes of Paragraph (2) herein, the term peace officer shall be defined and include any constable, sheriff, deputy sheriff, local or state policeman, game warden, federal law enforcement officer, jail or prison guard, parole officer, probation officer, judge,

first-degree murder case, the four responsive verdicts are now guilty, guilty of second-degree murder, guilty of manslaughter, and not guilty. La. Code Crim. Proc. Ann., Art. 814 (A)(1) (Supp. 1975). The jury must be instructed on all these verdicts, whether or not raised by the evidence or requested by the defendant.[4]

Under the former statute, the jury had the unfettered choice in any case where it found the defendant guilty of murder of returning either a verdict of guilty, which required the imposition of the death penalty, or a verdict of guilty without capital punishment, in which case the punishment was imprisonment at hard labor for life.[5]

---

district attorney, assistant district attorney or district attorneys' investigator.

"Whoever commits the crime of first degree murder shall be punished by death."

(In 1975, § 14:30 (1) was amended to add the crime of aggravated burglary as a predicate felony for first-degree murder. La. Acts 1975, No. 327, § 1.)

Louisiana Rev. Stat. Ann. § 14:30.1 (1974) provides:

"*Second degree murder*

"Second degree murder is the killing of a human being:

"(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

"(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill.

"Whoever commits the crime of second degree murder shall be imprisoned at hard labor for life and shall not be eligible for parole, probation or suspension of sentence for a period of twenty years."

(In 1975, § 14:30.1 was amended to increase the period of parole ineligibility from 20 to 40 years following a conviction for second-degree murder. La. Acts 1975, No. 380.)

[4] See *State* v. *Cooley*, 260 La. 768, 257 So. 2d 400 (1972).

[5] Louisiana Code Crim. Proc. Ann., Art. 814 (1967), enumerated "guilty without capital punishment" as one of the responsive verdicts available in a murder case. Article 817 provided that the jury in a

Under the new statute the jury is required to determine only whether both conditions existed at the time of the killing; if there was a specific intent to kill or to inflict great bodily harm, and the offender was engaged in an armed robbery, the offense is first-degree murder and the mandatory punishment is death. If only one of these conditions existed, the offense is second-degree murder and the mandatory punishment is imprisonment at hard labor for life. Any qualification or recommendation which a jury might add to its verdict—such as a recommendation of mercy where the verdict is guilty of first-degree murder—is without any effect.[6]

## III

The petitioner argues that the imposition of the death penalty under any circumstances is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. We reject this argument for the reasons stated today in *Gregg* v. *Georgia, ante,* at 168–187.

## IV

Louisiana, like North Carolina, has responded to *Furman* by replacing discretionary jury sentencing in capital cases with mandatory death sentences. Under the present Louisiana law, all persons found guilty of first-degree murder, aggravated rape, aggravated kidnaping, or treason are automatically sentenced to death. See La. Rev. Stat. Ann. §§ 14:30, 14:42, 14:44, 14:113 (1974).

There are two major differences between the Louisiana and North Carolina statutes governing first-degree murder cases. First, the crime of first-degree murder in North Carolina includes any willful, deliberate, and

capital case could qualify its verdict of guilty with the phrase "without capital punishment."

[6] La. Code Crim. Proc. Ann., Art. 817 (Supp. 1975).

premeditated homicide and any felony murder, whereas Louisiana limits first-degree murder to five categories of homicide—killing in connection with the commission of certain felonies; killing of a fireman or a peace officer in the performance of his duties; killing for remuneration; killing with the intent to inflict harm on more than one person; and killing by a person with a prior murder conviction or under a current life sentence. Second, Louisiana employs a unique system of responsive verdicts under which the jury in every first-degree murder case must be instructed on the crimes of first-degree murder, second-degree murder, and manslaughter and must be provided with the verdicts of guilty, guilty of second-degree murder, guilty of manslaughter, and not guilty. See La. Code Crim. Proc. Ann., Arts. 809, 814 (Supp. 1975); *State* v. *Cooley*, 260 La. 768, 771, 257 So. 2d 400, 401 (1972). By contrast, in North Carolina instructions on lesser included offenses must have a basis in the evidence adduced at trial. See *State* v. *Spivey*, 151 N. C. 676, 65 S. E. 995 (1909); cf. *State* v. *Vestal*, 283 N. C. 249, 195 S. E. 2d 297 (1973).

That Louisiana has adopted a different and somewhat narrower definition of first-degree murder than North Carolina is not of controlling constitutional significance. The history of mandatory death penalty statutes indicates a firm societal view that limiting the scope of capital murder is an inadequate response to the harshness and inflexibility of a mandatory death sentence statute. See *Woodson* v. *North Carolina, ante,* at 289–296. A large group of jurisdictions first responded to the unacceptable severity of the common-law rule of automatic death sentences for all murder convictions by narrowing the definition of capital homicide. Each of these juris-

---

[7] See La. Rev. Stat. Ann. § 14:30 (1974), set forth at n. 3, *supra*.

dictions found that approach insufficient and subsequently substituted discretionary sentencing for mandatory death sentences. See *Woodson* v. *North Carolina, ante,* at 290–292.[8]

The futility of attempting to solve the problems of mandatory death penalty statutes by narrowing the scope of the capital offense stems from our society's rejection of the belief that "every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender." *Williams* v. *New York,* 337 U. S. 241, 247 (1949). See also *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U. S. 51, 55 (1937). As the dissenting Justices in *Furman* noted, the 19th century movement away from mandatory death sentences was rooted in the recognition that "individual culpability is not always measured by the category of crime committed." 408 U. S., at 402 (BURGER, C. J., joined by BLACKMUN, POWELL, and REHNQUIST, JJ., dissenting).

The constitutional vice of mandatory death sentence statutes—lack of focus on the circumstances of the particular offense and the character and propensities of the offender—is not resolved by Louisiana's limitation of first-degree murder to various categories of killings. The diversity of circumstances presented in cases falling within the single category of killings during the commission of a specified felony, as well as the variety of possible offenders involved in such crimes, underscores the rigidity of Louisiana's enactment and its similarity to the North Carolina statute. Even the other more narrowly drawn categories of first-degree murder in the Louisiana law afford no meaningful opportunity for consideration of mitigating factors presented by the circum-

---

[8] At least 27 jurisdictions first limited the scope of their capital homicide laws by dividing murder into degrees and then later made death sentences discretionary even in first-degree murder cases.

stances of the particular crime or by the attributes of the individual offender.[9]

Louisiana's mandatory death sentence statute also fails to comply with *Furman*'s requirement that standardless jury discretion be replaced by procedures that safeguard against the arbitrary and capricious imposition of death sentences. The State claims that it has adopted satisfactory procedures by taking all sentencing authority from juries in capital murder cases. This was accomplished, according to the State, by deleting the jury's pre-*Furman* authority to return a verdict of guilty without capital punishment in any murder case. See La. Rev. Stat. Ann. § 14:30 (1974); La. Code Crim. Proc. Ann., Arts. 814, 817 (Supp. 1975).[10]

Under the current Louisiana system, however, every jury in a first-degree murder case is instructed on the crimes of second-degree murder and manslaughter and permitted to consider those verdicts even if there is not a scintilla of evidence to support the lesser verdicts. See La. Code Crim. Proc. Ann., Arts. 809, 814 (Supp. 1975). And, if a lesser verdict is returned, it is treated as an acquittal of all greater charges. See La. Code Crim. Proc. Ann., Art. 598 (Supp. 1975). This responsive verdict

[9] Only the third category of the Louisiana first-degree murder statute, covering intentional killing by a person serving a life sentence or by a person previously convicted of an unrelated murder, defines the capital crime at least in significant part in terms of the character or record of the individual offender. Although even this narrow category does not permit the jury to consider possible mitigating factors, a prisoner serving a life sentence presents a unique problem that may justify such a law. See *Gregg* v. *Georgia, ante,* at 186; *Woodson* v. *North Carolina, ante,* at 287 n. 7, 292–293, n. 25.

[10] Louisiana juries are instructed to return a guilty verdict for the offense charged if warranted by the evidence and to consider lesser verdicts only if the evidence does not justify a conviction on the greater offense. See *State* v. *Hill,* 297 So. 2d 660, 662 (La. 1974); cf. *State* v. *Selman,* 300 So. 2d 467, 471–473 (La. 1974).

procedure not only lacks standards to guide the jury in selecting among first-degree murderers, but it plainly invites the jurors to disregard their oaths and choose a verdict for a lesser offense whenever they feel the death penalty is inappropriate. There is an element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept this invitation to disregard the trial judge's instructions. The Louisiana procedure neither provides standards to channel jury judgments nor permits review to check the arbitrary exercise of the capital jury's *de facto* sentencing discretion. See *Woodson* v. *North Carolina, ante,* at 302–303.[11]

The Louisiana statute thus suffers from constitutional deficiencies similar to those identified in the North Carolina statute in *Woodson* v. *North Carolina, ante,* p. 280. As in North Carolina, there are no standards provided to guide the jury in the exercise of its power to select those first-degree murderers who will receive death sentences, and there is no meaningful appellate review of the jury's

---

[11] While it is likely that many juries will follow their instructions and consider only the question of guilt in reaching their verdict, it is only reasonable to assume, in light of past experience with mandatory death sentence statutes, that a significant number of juries will take into account the fact that the death sentence is an automatic consequence of any first-degree murder conviction in Louisiana. See *Woodson* v. *North Carolina, ante,* at 302–303. Those juries that do consider sentencing consequences are given no guidance in deciding when the ultimate sanction of death is an appropriate punishment and will often be given little or no evidence concerning the personal characteristics and previous record of an individual defendant. Moreover, there is no judicial review to safeguard against capricious sentencing determinations. Indeed, there is no judicial review of the sufficiency of the evidence to support a conviction. See *State* v. *Brumfield,* 319 So. 2d 402, 404 (La. 1975); *State* v. *Evans,* 317 So. 2d 168, 170 (La. 1975); *State* v. *Douglas,* 278 So. 2d 485, 491 (La. 1973).

decision. As in North Carolina, death sentences are mandatory upon conviction for first-degree murder. Louisiana's mandatory death sentence law employs a procedure that was rejected by that State's legislature 130 years ago [12] and that subsequently has been renounced by legislatures and juries in every jurisdiction in this Nation. See *Woodson* v. *North Carolina, ante,* at 291–296. The Eighth Amendment, which draws much of its meaning from "the evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (plurality opinion), simply cannot tolerate the reintroduction of a practice so thoroughly discredited.

Accordingly, we find that the death sentence imposed upon the petitioner under Louisiana's mandatory death sentence statute violates the Eighth and Fourteenth Amendments and must be set aside. The judgment of the Supreme Court of Louisiana is reversed insofar as it upheld the death sentence imposed upon the petitioner, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BRENNAN, concurring in the judgment.

For the reasons stated in my dissenting opinion in *Gregg* v. *Georgia, ante,* p. 227, I concur in the judgment that sets aside the death sentence imposed under the Louisiana death sentence statute as violative of the Eighth and Fourteenth Amendments.

MR. JUSTICE MARSHALL, concurring in the judgment.

For the reasons stated in my dissenting opinion in *Gregg* v. *Georgia, ante,* p. 231, I am of the view that the death penalty is a cruel and unusual punishment for-

---

[12] See La. Laws 1846, c. 139.

bidden by the Eighth and Fourteenth Amendments. I therefore concur in the Court's judgment.

MR. CHIEF JUSTICE BURGER, dissenting.

I dissent for the reasons set forth in my dissent in *Furman* v. *Georgia,* 408 U. S. 238, 375 (1972).

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, dissenting.

Under the Louisiana statutes in effect prior to 1973, there were three grades of criminal homicide—murder, manslaughter, and negligent homicide. La. Rev. Stat. Ann. § 14:29 (1951). Murder was punishable by death, La. Rev. Stat. Ann. § 14:30 (1951); but a jury finding a defendant guilty of murder was empowered to foreclose the death penalty by returning a verdict of "guilty without capital punishment." La. Rev. Stat. Ann. § 15:409 (1951). Following *Furman* v. *Georgia,* 408 U. S. 238 (1972), which the Louisiana Supreme Court held effectively to have invalidated the Louisiana death penalty,[1] the statutes were amended to provide four grades of criminal homicide: first-degree murder, second-degree murder, manslaughter, and negligent homicide. La. Rev. Stat. Ann. § 14:29 (1974 Supp.). First-degree murder was defined as the killing of a human in prescribed situations, including where the offender, with specific intent to kill or to inflict great bodily harm, takes another's life while per-

---

[1] *State* v. *Sinclair,* 263 La. 377, 268 So. 2d 514 (1972); *State* v. *Poland,* 263 La. 269, 268 So. 2d 221 (1972); *State* v. *Singleton,* 263 La. 267, 268 So. 2d 220 (1972); *State* v. *Williams,* 263 La. 284, 268 So. 2d 227 (1972); *State* v. *Square,* 263 La. 291, 268 So. 2d 229 (1972); *State* v. *Douglas,* 263 La. 294, 268 So. 2d 231 (1972); *State* v. *McAllister,* 263 La. 296, 268 So. 2d 231 (1972); *State* v. *Strong,* 263 La. 298, 268 So. 2d 232 (1972); *State* v. *Marks,* 263 La. 355, 268 So. 2d 253 (1972).

petrating or attempting to perpetrate aggravated kidnaping, aggravated rape, or armed robbery. La. Rev. Stat. Ann. § 14:30 (1974). The new statute provides that "whoever commits the crime of first degree murder shall be punished by death," and juries are no longer authorized to return guilty verdicts without capital punishment.[2] As had been the case before 1973, the possible

---

[2] Section 14:30 of La. Rev. Stat. Ann. (1974 Supp.), which became effective July 2, 1973, provided:

"First degree murder is the killing of a human being:

"(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated rape or armed robbery; or

"(2) When the offender has a specific intent to kill, or to inflict great bodily harm upon, a fireman or a peace officer who was engaged in the performance of his lawful duties; or

"(3) Where the offender has a specific intent to kill or to inflict great bodily harm and has previously been convicted of an unrelated murder or is serving a life sentence; or

"(4) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person;

"(5) When the offender has specific intent to commit murder and has been offered or has received anything of value for committing the murder.

"For the purposes of paragraph (2) herein, the term peace officer shall be defined and include any constable, sheriff, deputy sheriff, local or state policeman, game warden, federal law enforcement officer, jail or prison guard, parole officer, probation officer, judge, district attorney, assistant district attorney or district attorneys' investigator.

"Whoever commits the crime of first degree murder shall be punished by death.

"Amended by Acts 1973, No. 109, § 1."

Subsection (1) of the the statute was amended in 1975 to include "aggravated burglary." La. Acts 1975, No. 327, § 1.

As petitioner here concedes, Louisiana's post-*Furman* legislation, *supra*, "narrowed" "the range of cases in which the punishment of death *might* be inflicted." Brief for Petitioner 31 (emphasis in original). Prior to the 1973 legislation, *all* murders were pun-

jury verdicts in first-degree murder cases are also specified by statute. As amended in 1973, these "responsive verdicts," as to which juries were to be instructed in every first-degree murder case, are: "guilty," "guilty of second degree murder," "guilty of manslaughter," and "not guilty." La. Code Crim. Proc., Art. 814 (A)(1) (Supp. 1975).

The issue in this case is whether the imposition of the death penalty under this statutory scheme upon a defendant found guilty of first-degree murder is consistent with the Eighth Amendment, which forbids the infliction of "cruel and unusual punishments" and which by virtue of the Fourteenth Amendment is binding upon the States. *Robinson* v. *California*, 370 U. S. 660 (1962). I am convinced that it is and dissent from the Court's judgment.

I

On August 18, 1973, Richard G. Lowe of Lake Charles, La., was found dead in the Texaco service station where

---

ishable by the death penalty. Section 14:30, La. Rev. Stat. Ann. (1951), which was applicable prior to *Furman,* provided:

"Murder is the killing of a human being,

"(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

"(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated arson, aggravated burglary, aggravated kidnapping, aggravated rape, armed robbery, or simple robbery, even though he has no intent to kill.

"Whoever commits the crime of murder shall be punished by death."

In addition to murder, Louisiana prior to *Furman* provided for the death penalty in cases of aggravated rape (§ 14:42), aggravated kidnaping (§ 14:44), and treason (§ 14:113). Louisiana's post-*Furman* legislation re-enacted the death penalty for aggravated rape (§ 14:42 (1975 Supp.)), aggravated kidnaping (§ 14:44 (1974 Supp.)), and treason (§ 14:113 (1974 Supp.)). The constitutionality of these statutes is not before the Court.

he worked as an attendant. He had been shot four times in the head with a pistol which was not found on the scene, but which, as it turned out, had been kept by the station manager in a drawer near the cash register. The gun was later recovered from the owner of a bar and was traced to petitioner, who was charged with first-degree murder in an indictment alleging that "with the specific intent to kill or to inflict great bodily harm" and "while engaged in . . . armed robbery," he had killed Richard G. Lowe.

At the trial Calvin Arceneaux, testifying for the prosecution, stated that he had participated in the robbery and that he had taken the gun from the drawer and given it to petitioner, who had said he wanted it because he had "always wanted to kill a white dude." The attendant, who had been overpowered, remained inside the station with petitioner while Arceneaux, posing as the station attendant, went outside to tend a customer. According to Arceneaux, Lowe was shot during this interval. Another witness, Everett Walls, testified that he had declined to participate in the robbery but by chance had seen the petitioner at the station with a gun in his hand. According to a third witness, Huey Cormier, who also had refused petitioner's invitation to participate, petitioner had come to Cormier's house early on August 18 and had said that he "had just shot that old man . . . at the filling station." Record 134–135.

The case went to the jury under instructions advising the jury of the State's burden of proof and cf the charge in the indictment that petitioner had killed another person with "specific intent to kill or to inflict great bodily harm and done when the accused was engaged in the perpetration of armed robbery." The elements which the State was required to prove beyond reasonable doubt were explained, including the elements of first-degree

murder and of armed robbery.[3]   In accordance with the statute the court also explained the possible verdicts other than first-degree murder: "The law provides that

[3] "There are certain facts that must be proved by the State to your satisfaction and beyond a reasonable doubt before you can return a verdict of guilty in this case.

"First, the State must prove that a crime was committed and that it was committed within the Parish of Calcasieu.

"Second, the State must prove that the alleged crime was committed by Stanislaus Roberts, the person named in the indictment, and on trial in this case.

"Third, the State must prove that Richard G. Lowe, the person named in the indictment as having been killed, was in fact killed.

"Fourth, the State must prove that the killing occurred while the defendant was engaged in an armed robbery.

"Fifth, the State must prove that the killing occurred on or about the date alleged in the indictment, although I charge you that it is not necessary that the State prove the exact date alleged in the indictment.

"Sixth, the State must prove that the offense committed was murder.

"First degree murder is defined in LSA–R. S. 14:30 as follows:

" 'First degree murder is the killing of a human being:

" '(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated rape or armed robbery; . . .'

"The indictment in this case charged Stanislaus Roberts under the statute. The State then, under this indictment, must prove that the killing was unlawful and done with a specific intent to kill or to inflict great bodily harm and done when the accused was engaged in the perpetration of armed robbery.

"Armed robbery is defined in LSA–R. S. 14:64 as follows:

" 'Armed robbery is the theft of anything of value from the person of another or which is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.'

"Theft includes the taking of anything of value which belongs to another without his consent.   An intent to deprive the other permanently of whatever may be the subject of the taking is essential.

"A 'dangerous weapon' is defined by the law of Louisiana as 'any

in a trial of murder in the first degree, if the jury is not convinced beyond a reasonable doubt that the accused is guilty of the crime of murder in the first degree, but is

gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.'

"The test of a dangerous weapon is not whether the weapon is inherently dangerous, but whether it is dangerous 'in the manner used.' Whether a dangerous weapon was used in this case is a question to be determined by the jury in considering: (1) whether a weapon was used; (2) the nature of a weapon if so used; (3) and the manner in which it may have been used; under the law and definition referred to above.

"An essential element of the crime of armed robbery is specific criminal intent, which is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.

"The requisite intent may be established by direct or positive evidence, or it may be inferred from the acts or conduct of the defendant or from other facts or circumstances surrounding the alleged commission of the offense. You may consider the acts or conduct of the defendant prior to, at the time of, or after the alleged offense, as well as all other facts by which you might ascertain whether the accused intended to commit the offense charged.

"To constitute the crime of first degree murder, the offender must have a specific intent to kill or inflict great bodily harm, and this 'specific intent' must actually exist in the mind of the offender at the time of the killing. If a human being is killed, when the offender is charged under this statute, but at the time of the killing, the offender did not have a specific intent to kill or inflict great bodily harm, then, the killing could not be murder in the first degree, although it might be murder in the second degree, manslaughter, justifiable homicide or an accident. The specific intent to kill or to inflict great bodily harm not only must exist at the time of the killing, but it must also be felonious, that is, it must be wrong or without any just cause or excuse.

"I charge you that it is not necessary that this specific intent should have existed in the mind of the offender for any particular length of time before the killing in order to constitute the crime of murder. If the will accompanies the act, that is, if the specific

convinced beyond a reasonable doubt that he is guilty of murder in the second degree, it should render a verdict of guilty of murder in the second degree." The elements of second-degree murder and also of manslaughter were then explained, whereupon the court instructed:

"If you should conclude that the defendant is not guilty of murder in the first degree, but you are convinced beyond a reasonable doubt that he is guilty of murder in the second degree it would be your duty to find that defendant guilty of murder in the second degree.

"If you should conclude that the defendant is not guilty of murder in the first degree or murder in the second degree, but you are convinced beyond a reasonable doubt that he is guilty of manslaughter, it would then be your duty to find the defendant guilty of manslaughter.

"If you should conclude that the defendant is not guilty of murder in the first degree, or murder in the second degree or manslaughter, it would then be your duty to find the defendant not guilty."

Finally, the court instructed the jury:

"To summarize, you may return any one of the following verdicts:

"1. Guilty as charged.

"2. Guilty of second degree murder.

"3. Guilty of manslaughter.

"4. Not guilty.

"Accordingly, I will now set forth the proper form

---

intent to kill or to inflict great bodily [harm] actually exists in the mind of the offender at the moment of the killing, even though this specific intent was formed only a moment prior to the act itself which causes death, it would be as completely sufficient to make the act murder as if the intent had been formed on the previous day, an hour earlier, or any other time."

of each verdict that may be rendered, reminding you that only one verdict shall be rendered.

"If you are convinced beyond a reasonable doubt that the defendant is guilty of the offense charged, the form of your verdict should be: 'We, the jury, find the defendant guilty as charged.'

"If you are not convinced beyond a reasonable doubt that the defendant is guilty of murder in the first degree but you are convinced beyond a reasonable doubt that the defendant is guilty of murder in the second degree, the form of your verdict would be: 'We, the jury, find the defendant guilty of second degree murder.'

"If you are not convinced beyond a reasonable doubt that the defendant is guilty of murder in the first degree or murder in the second degree, but you are convinced beyond a reasonable doubt that the defendant is guilty of manslaughter, the form of your verdict would be: 'We, the jury, find the defendant guilty of manslaughter.'

"If you are not convinced that the defendant is guilty of murder in the first degree, murder in the second degree or manslaughter, the form of your verdict would be: 'We, the jury, find the defendant not guilty.'"

The jury found the defendant guilty of first-degree murder and the death sentence was imposed. On appeal, the conviction was affirmed, the Louisiana Supreme Court rejecting petitioner's challenge to the death penalty based on the Eighth Amendment. 319 So. 2d 317 (1975).

## II

Petitioner mounts a double attack on the death penalty imposed upon him: First, that the statute under which his sentence was imposed is too little different from

the provision at issue in *Furman* v. *Georgia* to escape the strictures of our decision in that case; second, that death is a cruel and unusual punishment for any crime committed by any defendant under any conditions, an argument presented in *Furman* and there rejected by four of the six Justices who addressed the issue. I disagree with both submissions.

I cannot conclude that the current Louisiana first-degree murder statute is insufficiently different from the statutes invalidated in *Furman*'s wake to avoid invalidation under that case. As I have already said, under prior Louisiana law, one of the permissible verdicts that a jury in any capital punishment case was authorized by statute and 'by its instructions to return was "guilty without capital punishment." Dispensing with the death penalty was expressly placed within the uncontrolled discretion of the jury and in no case involved a breach of its instructions or the controlling statute. A guilty verdict carrying capital punishment required a unanimous verdict; any juror, consistent with his instruction and whatever the evidence might be, was free to vote for a verdict of guilty without capital punishment, thereby, if he persevered, at least foreclosing a capital punishment verdict at that trial.

Under this or similar jury-sentencing arrangements which were in force in Louisiana, Georgia, and most other States that authorized capital punishment, the death penalty came to be imposed less and less frequently, so much so that in *Furman* v. *Georgia* the Court concluded that in practice criminal juries, exercising their lawful discretion, were imposing it so seldom and so freakishly and arbitrarily that it was no longer serving the legitimate ends of criminal justice and had come to be cruel and unusual punishment violative of the Eighth Amendment. It was in response to this judgment that Louisiana sought to

re-enact the death penalty as a constitutionally valid punishment by redefining the crime of first-degree murder and by making death the mandatory punishment for those found guilty of that crime.

To implement this aim, the present Louisiana law eliminated the "guilty without capital punishment" verdict. Jurors in first-degree murder cases are no longer instructed that they have discretion to withhold capital punishment. Their instructions now are to find the defendant guilty if they believe beyond a reasonable doubt that he committed the crime with which he is charged. A verdict of guilty carries a mandatory death sentence. In the present case, the jury was instructed as to the specific elements constituting the crime of felony murder which the indictment charged. They were also directed that if they believed beyond reasonable doubt that Roberts committed these acts, they were to return a verdict of guilty as charged in the indictment. The jury could not, if it believed the defendant had committed the crime, nevertheless dispense with the death penalty.

The difference between a jury's having and not having the lawful discretion to spare the life of the defendant is apparent and fundamental. It is undeniable that the unfettered discretion of the jury to save the defendant from death was a major contributing factor in the developments which led us to invalidate the death penalty in *Furman* v. *Georgia*. This factor Louisiana has now sought to eliminate by making the death penalty compulsory upon a verdict of guilty in first-degree murder cases. As I see it, we are now in no position to rule that the State's present law, having eliminated the overt discretionary power of juries, suffers from the same constitutional infirmities which led this Court to invalidate the Georgia death penalty statute in *Furman* v. *Georgia*.

Even so, petitioner submits that in every capital case the court is required to instruct the jury with respect to lesser included offenses and that the jury therefore has unlimited discretion to foreclose the death penalty by finding the defendant guilty of a lesser included offense for which capital punishment is not authorized. The difficulty with the argument is illustrated by the instructions in this case. The jury was not instructed that it could in its discretion convict of a lesser included offense. The jury's plain instructions, instead, were to return a verdict of guilty of murder as charged if it believed from the evidence that Roberts had committed the specific acts constituting the offense charged and defined by the court. Only if they did not believe Roberts had committed the acts charged in the indictment were the jurors free to consider whether he was guilty of the lesser included offense of second-degree murder, and only if they did not find beyond a reasonable doubt that Roberts was guilty of second-degree murder were they free to consider the offense of manslaughter. As the Supreme Court of Louisiana said in *State* v. *Hill,* 297 So. 2d 660, 662 (1974), and repeated in this case, 319 So. 2d, at 322, "the use of these lesser verdicts . . . is contingent upon the jury finding insufficient evidence to convict the defendant of first degree murder, with which he is charged." See also *State* v. *Selman,* 300 So. 2d 467, 473 (La. 1974), cert. pending, No. 74–6065.

It is true that the jury in this case, like juries in other capital cases in Louisiana and elsewhere, may violate its instructions and convict of a lesser included offense despite the evidence. But for constitutional purposes I am quite unwilling to equate the raw power of nullification with the unlimited discretion extended jurors under prior Louisiana statutes. In *McGautha* v. *California,* 402 U. S. 183 (1971), we rejected the argument that vesting

standardless sentencing discretion in the jury was unconstitutional under the Due Process Clause. In arriving at that judgment, we noted that the practice of jury sentencing had emerged from the "rebellion against the common-law rule imposing a mandatory death sentence on all convicted murderers," *id.*, at 198, and from the unsatisfactory experience with attempting to define the various grades of homicide and to specify those for which the death penalty was required. Vesting complete sentencing power in the jury was the upshot. The difficulties adverted to in *McGautha,* however, including that of jury nullification, are inadequate to require invalidation of the Louisiana felony-murder rule on the ground that jurors will so often and systematically refuse to follow their instructions that the administration of the death penalty under the current law will not be substantially different from that which obtained under prior statutes.

Nor am I convinced that the Louisiana death penalty for first-degree murder is substantially more vulnerable because the prosecutor is vested with discretion as to the selection and filing of charges, by the practice of plea bargaining or by the power of executive clemency. Petitioner argues that these characteristics of the criminal justice system in Louisiana, combined with the discretion arguably left to the jury as discussed above, insure that the death penalty will be as seldom and arbitrarily applied as it was under the predecessor statutes. The Louisiana statutes, however, define the elements of first-degree murder, and I cannot accept the assertion that state prosecutors will systematically fail to file first-degree murder charges when the evidence warrants it or to seek convictions for first-degree murder on less than adequate evidence. Of course, someone *must* exercise discretion and judgment as to what charges are to be filed and against whom; but this essential process is

nothing more than the rational enforcement of the State's criminal law and the sensible operation of the criminal justice system. The discretion with which Louisiana's prosecutors are invested and which appears to be no more than normal, furnishes no basis for inferring that capital crimes will be prosecuted so arbitrarily and infrequently that the present death penalty statute is invalid under *Furman* v. *Georgia*.

I have much the same reaction to plea bargaining and executive clemency. A prosecutor may seek or accept pleas to lesser offenses where he is not confident of his first-degree murder case, but this is merely the proper exercise of the prosecutor's discretion as I have already discussed. So too, as illustrated by this case and the North Carolina case, *Woodson* v. *North Carolina, ante,* p. 280, some defendants who otherwise would have been tried for first-degree murder, convicted, and sentenced to death are permitted to plead to lesser offenses because they are willing to testify against their codefendants. This is a grisly trade, but it is not irrational; for it is aimed at insuring the successful conclusion of a first-degree murder case against one or more other defendants. Whatever else the practice may be, it is neither inexplicable, freakish, nor violative of the Eighth Amendment. Nor has it been condemned by this Court under other provisions of the Constitution. *Santobello* v. *New York,* 404 U. S. 257 (1971); *North Carolina* v. *Alford,* 400 U. S. 25 (1970); *Parker* v. *North Carolina,* 397 U. S. 790 (1970); *Brady* v. *United States,* 397 U. S. 742 (1970). See also *Chaffin* v. *Stynchcombe,* 412 U. S. 17, 30–31 (1973).

As for executive clemency, I cannot assume that this power, exercised by governors and vested in the President by Art. II, § 2, of the Constitution, will be used in a standardless and arbitrary manner. It is more reason-

able to expect the power to be exercised by the Executive Branch whenever it is concluded that the criminal justice system has unjustly convicted a defendant of first-degree murder and sentenced him to death. The country's experience with the commutation power does not suggest that it is a senseless lottery, that it operates in an arbitrary or discriminatory manner, or that it will lead to reducing the death penalty to a merely theoretical threat that is imposed only on the luckless few.

I cannot conclude, as do MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS (hereinafter the plurality), that under the present Louisiana law, capital punishment will occur so seldom, discriminatorily, or freakishly that it will fail to satisfy the Eighth Amendment as construed and applied in *Furman* v. *Georgia.*

### III

I also cannot agree with the petitioner's other basic argument that the death penalty, however imposed and for whatever crime, is cruel and unusual punishment. The opposing positions on this issue, as well as the history of the death penalty, were fully canvassed by various Justices in their separate opinions in *Furman* v. *Georgia,* and these able and lucid presentations need not be repeated here. It is plain enough that the Constitution drafted by the Framers expressly made room for the death penalty. The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . ." and that no person shall be "twice put in jeopardy of life or limb . . . nor be deprived of life . . . without due process of law." The Fourteenth Amendment, adopted three-quarters of a century later, likewise enjoined the States from depriving any person of "his life" without due process of law.

Since the very first Congress, federal law has defined crimes for which the death penalty is authorized. Capital punishment has also been part of the criminal justice system of the great majority of the States ever since the Union was first organized. Until *Furman* v. *Georgia,* this Court's opinions, if they did not squarely uphold the death penalty, consistently assumed its constitutionality. *Wilkerson* v. *Utah,* 99 U. S. 130 (1879); *In re Kemmler*, 136 U. S. 436 (1890); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459 (1947); *McGautha* v. *California,* 402 U. S. 183 (1971); *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968). In *Trop* v. *Dulles,* 356 U. S. 86, 99 (1958), four Members of the Court—Mr. Chief Justice Warren and Justices Black, Douglas, and Whittaker—agreed that "[w]hatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty."

Until *Furman* v. *Georgia,* this was the consistent view of the Court and of every Justice who in a published opinion had addressed the question of the validity of capital punishment under the Eighth Amendment. In *Furman,* it was concluded by at least two Justices [4] that the death penalty had become unacceptable to the great majority of the people of this country and for that reason, alone or combined with other reasons, was invalid

---

[4] Mr. Justice Marshall wrote that the death penalty was invalid for several independent reasons, one of which was that "it is morally unacceptable to the people of the United States at this time in our history." 408 U. S., at 360. That capital punishment "has been almost totally rejected by contemporary society," *id.,* at 295, was one of four factors which together led Mr. Justice Brennan to invalidate the statute before us in *Furman* v. *Georgia.*

under the Eighth Amendment, which must be construed and applied to reflect the evolving moral standards of the country. *Trop* v. *Dulles, supra,* at 111; *Weems* v. *United States,* 217 U. S. 349, 378 (1910). That argument, whether or not accurate at that time, when measured by the manner in which the death penalty was being administered under the then-prevailing statutory schemes, is no longer descriptive of the country's attitude. Since the judgment in *Furman,* Congress and 35 state legislatures re-enacted the death penalty for one or more crimes.[5] All of these States authorize the death

---

[5] The statutes are summarized in the Appendix to petitioner's brief in No. 73–7031, *Fowler* v. *North Carolina,* cert. granted, 419 U. S. 963 (1974), and in Appendix A to the petitioner's brief in No. 75–5394, *Jurek* v. *Texas, ante,* p. 262, decided this day. The various types of post-*Furman* statutes which have been enacted are described and analyzed in the Note, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv. L. Rev. 1690 (1974).

Following the invalidation of the death penalty in California by the California Supreme Court on state constitutional grounds in *People* v. *Anderson,* 6 Cal. 3d 628, 493 P. 2d 880, cert. denied, 406 U. S. 958 (1972), the State Constitution was amended by initiative and referendum to reinstate the penalty (with approximately two-thirds of those voting approving the measure). Cal. Const., Art. I, § 27 (effective Nov. 7, 1972). Approximately 64% of the voters at the 1968 Massachusetts general election voted "yes" to a referendum asking "Shall the commonwealth of Massachusetts retain the death penalty for crime?" See *Commonwealth* v. *O'Neal,* —— Mass. ——, ——, 339 N. E. 2d 676, 708 (1975) (Reardon, J., dissenting). For other state referenda approving capital punishment, see *Furman* v. *Georgia,* 408 U. S., at 437–439 (Powell, J., dissenting): Oregon (1964), Colorado (1966), Illinois (1970).

There have also been public opinion polls on capital punishment, see, *e. g.,* S. Rep. No. 93–721, pp. 13–14 (1974), but their validity and reliability have been strongly criticized, see, *e. g.,* Vidmar & Ellsworth, Public Opinion and the Death Penalty, 26 Stan. L. Rev. 1245 (1974), and indeed neither the parties here nor *amici* rely on

penalty for murder of one kind or another. With these profound developments in mind, I cannot say that capital punishment has been rejected by or is offensive to the prevailing attitudes and moral presuppositions in the United States or that it is always an excessively cruel or severe punishment or always a disproportionate punishment for any crime for which it might be imposed.[6] These grounds for invalidating the death penalty are foreclosed by recent events, which this Court must accept as demonstrating that capital punishment is acceptable to the contemporary community as just punishment for at least some intentional killings.

It is apparent also that Congress and 35 state legislatures are of the view that capital punishment better serves the ends of criminal justice than would life imprisonment and that it is therefore not excessive in the sense that it serves no legitimate legislative or social ends. Petitioner Roberts, to the contrary, submits that life imprisonment obviously would better serve the end of reformation or rehabilitation and that there is no satisfactory evidence that punishing by death serves more effectively than does life imprisonment the other major ends of imposing serious criminal sanctions: incapacitation

---

such polls as relevant to the issue before us. Brief for United States as *Amicus Curiae* 54.

[6] As shown by MR. JUSTICE POWELL's opinion in *Furman* v. *Georgia*, 408 U. S., at 442–443, n. 37, state death penalty statutes withstood constitutional challenge in the highest courts of 25 States. Post-*Furman* legislation has been widely challenged but has been sustained as not contrary to the Eighth and Fourteenth Amendments in the five States now before us and in Oklahoma (*e. g., Davis* v. *State*, 542 P. 2d 532 (1975)). Final resolutions of cases in many other States is apparently awaiting our decision in the cases decided today. But see *Commonwealth* v. *O'Neal, supra,* and *People ex rel. Rice* v. *Cunningham*, 61 Ill. 2d 353, 336 N. E. 2d 1 (1975), invalidating the death penalty on state-law grounds.

of the prisoner, the deterrence of others, and moral re-enforcement and retribution. The death penalty is therefore cruel and unusual, it is argued, because it is the purposeless taking of life and the needless imposition of suffering.

The widespread re-enactment of the death penalty, it seems to me, answers any claims that life imprisonment is adequate punishment to satisfy the need for reproba-tion or retribution. It also seems clear enough that death finally forecloses the possibility that a prisoner will commit further crimes, whereas life imprisonment does not. This leaves the question of general deterrence as the principal battleground: Does the death penalty more effectively deter others from crime than does the threat of life imprisonment?

The debate on this subject started generations ago and is still in progress. Each side has a plethora of fact and opinion in support of its position,[7] some of it quite old

---

[7] The debate over the general deterrent effect of the death pen-alty and the relevant materials were canvassed exhaustively by MR. JUSTICE MARSHALL in his separate concurring opinion in *Fur-man, supra,* at 345–354. The debate has intensified since then. See Part III of Brief for Petitioner in No. 73–7301, *Fowler* v. *North Carolina, supra* (esp. pp. 121–130, and App. E, pp. 1e–10e), incorporated by reference in petitioner's brief in this case. See also Brief for United States as *Amicus Curiae* 34–35 in this and related cases. The focal point of the most recent stage of the debate has been Prof. Isaac Ehrlich's study of the issue. Ehrlich, The Deterrent Effect of Capital Punishment: A Question of Life and Death, 65 Am. Econ. Rev. 397 (June 1975). For reactions to and comments on the Ehrlich study, see Statistical Evidence on the Deterrent Effect of Capital Punishment, 85 Yale L. J. 164–227 (1975). See also Passell, The Deterrent Effect of the Death Pen-alty: A Statistical Test, 28 Stan. L. Rev. 61 (1975).

For analysis of some of the reasons for the inconclusive nature of statistical studies on the issue, see, *e. g.,* Report of the Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶¶ 62–67 (1953); Gibbs, Crime, Punishment, and Deterrence, 48 Sw. Soc.

and some of it very new; but neither has yet silenced the other. I need not detail these conflicting materials, most of which are familiar sources. It is quite apparent that the relative efficacy of capital punishment and life imprisonment to deter others from crime remains a matter about which reasonable men and reasonable legislators may easily differ. In this posture of the case, it would be neither a proper or wise exercise of the power of judicial review to refuse to accept the reasonable conclusions of Congress and 35 state legislatures that there are indeed certain circumstances in which the death penalty is the more efficacious deterrent of crime.

It will not do to denigrate these legislative judgments as some form of vestigial savagery or as purely retributive in motivation; for they are solemn judgments, reasonably based, that imposition of the death penalty will save the lives of innocent persons. This concern for life and human values and the sincere efforts of the States to pursue them are matters of the greatest moment with which the judiciary should be most reluctant to interfere. The issue is not whether, had we been legislators, we would have supported or opposed the capital punishment statutes presently before us. 'The question here under discussion is whether the Eighth Amendment requires us to interfere with the enforcement of these statutes on the grounds that a sentence of life imprisonment for the crimes at issue would as well have served the ends of criminal justice. In my view, the Eighth Amend-

---

Sci. Q. 515 (1968); Hart, Murder and the Principles of Punishment: England and the United States, 52 Nw. U. L. Rev. 433, 457–458 (1957). See also Posner, The Economic Approach to Law, 53 Tex. L. Rev. 757, 766–768 (1975).

For a study of the deterrent effect of punishment generally, see F. Zimring & G. Hawkins, Deterrence (1973), and especially id., at 16, 18–19, 31, 62–64, 186–190 (for a general discussion of capital punishment as a deterrent).

ment provides no warrant for overturning these convictions on these grounds.

## IV

The plurality offers two additional reasons for invalidating the Louisiana statute, neither of which had been raised by the parties and with both of which I disagree.

The plurality holds the Louisiana statute unconstitutional for want of a separate sentencing proceeding in which the sentencing authority may focus on the sentence and consider some or all of the aggravating and mitigating circumstances. In *McGautha* v. *California,* 402 U. S. 183 (1971), after having heard the same issues argued twice before in *Maxwell* v. *Bishop,* 398 U. S. 262 (1970), we specifically rejected the claims that a defendant's "constitutional rights were infringed by permitting the jury to impose the death penalty without governing standards" and that "the jury's imposition of the death sentence in the same proceeding and verdict as determined the issue of guilt was [not] constitutionally permissible." 402 U. S., at 185. With respect to the necessity of a bifurcated criminal trial, we had reached essentially the same result in *Spencer* v. *Texas,* 385 U. S. 554 (1967). In spite of these cases, the plurality holds that the State must provide a procedure under which the sentencer may separately consider the character and record of the individual defendant, along with the circumstances of the particular offense, including any mitigating circumstances that may exist. For myself, I see no reason to reconsider *McGautha* and would not invalidate the Louisiana statute for its failure to provide what *McGautha* held it need not provide. I still share the concluding remarks of the Court in *McGautha* v. *California:*

> "It may well be, as the American Law Institute and the National Commission on Reform of Federal

Criminal Laws have concluded, that bifurcated trials and criteria for jury sentencing discretion are superior means of dealing with capital cases if the death penalty is to be retained at all. But the Federal Constitution, which marks the limits of our authority in these cases, does not guarantee trial procedures that are the best of all worlds, or that accord with the most enlightened ideas of students of the infant science of criminology, or even those that measure up to the individual predilections of members of this Court. See *Spencer* v. *Texas,* 385 U. S. 554 (1967). The Constitution requires no more than that trials be fairly conducted and that guaranteed rights of defendants be scrupulously respected. From a constitutional standpoint we cannot conclude that it is impermissible for a State to consider that the compassionate purposes of jury sentencing in capital cases are better served by having the issues of guilt and punishment determined in a single trial than by focusing the jury's attention solely on punishment after the issue of guilt has been determined.

"Certainly the facts of these gruesome murders bespeak no miscarriage of justice. The ability of juries, unassisted by standards, to distinguish between those defendants for whom the death penalty is appropriate punishment and those for whom imprisonment is sufficient is indeed illustrated by the discriminating verdict of the jury in McGautha's case, finding Wilkinson the less culpable of the two defendants and sparing his life.

"The procedures which petitioners challenge are those by which most capital trials in this country are conducted, and by which all were conducted until a few years ago. We have determined that these

procedures are consistent with the rights to which petitioners were constitutionally entitled, and that their trials were entirely fair. Having reached these conclusions we have performed our task of measuring the States' process by federal constitutional standards . . . ." 402 U. S., at 221–222.

Implicit in the plurality's holding that a separate proceeding must be held at which the sentencer may consider the character and record of the accused is the proposition that States are constitutionally prohibited from considering any crime, no matter how defined, so serious that every person who commits it should be put to death regardless of extraneous factors related to his character. Quite apart from *McGautha* v. *California, supra,* I cannot agree. It is axiomatic that the major justification for concluding that a given defendant deserves to be punished is that he committed a crime. Even if the character of the accused *must* be considered under the Eighth Amendment, surely a State is not constitutionally forbidden to provide that the commission of certain crimes conclusively establishes that the criminal's character is such that he deserves death. Moreover, quite apart from the character of a criminal, a State should constitutionally be able to conclude that the need to deter some crimes and that the likelihood that the death penalty will succeed in deterring these crimes is such that the death penalty may be made mandatory for all people who commit them. Nothing resembling a reasoned basis for the rejection of these propositions is to be found in the plurality opinion.

The remaining reason offered for invalidating the Louisiana statute is also infirm. It is said that the Eighth Amendment forbids the legislature to require imposition of the death penalty when the elements of the specified crime have been proved to the satisfac-

tion of the jury because historically the concept of the mandatory death sentence has been rejected by the community and departs so far from contemporary standards with respect to the imposition of capital punishment that it must be held unconstitutional.

Although the plurality seemingly makes an unlimited pronouncement, it actually stops short of invalidating any statute making death the required punishment for any crime whatsoever. Apparently there are some crimes for which the plurality in its infinite wisdom will permit the States to require the death sentence to be imposed without the additional procedures which its opinion seems to mandate. There have always been mandatory death penalties for at least some crimes, and the legislatures of at least two States have now again embraced this approach in order to serve what they deem to be their own penological goals.

Furthermore, JUSTICES STEWART, POWELL, and STEVENS uphold the capital punishment statute of Texas, under which capital punishment is required if the defendant is found guilty of the crime charged and the jury answers two additional questions in the affirmative. Once that occurs, no discretion is left to the jury; death is mandatory. Although Louisiana juries are not required to answer these precise questions, the Texas law is not constitutionally distinguishable from the Louisiana system under which the jury, to convict, must find the elements of the crime, including the essential element of intent to kill or inflict great bodily harm, which, according to the instructions given in this case, must be felonious, "that is, it must be wrong or without any just cause or excuse."

As the plurality now interprets the Eighth Amendment, the Louisiana and North Carolina statutes are infirm because the jury is deprived of all discretion once it finds the defendant guilty. Yet in the next breath it invali-

dates these statutes because they are said to invite or allow too much discretion: Despite their instructions, when they feel that defendants do not deserve to die, juries will so often and systematically disobey their instructions and find the defendant not guilty or guilty of a noncapital offense that the statute fails to satisfy the standards of *Furman* v. *Georgia*. If it is truly the case that Louisiana juries will exercise *too much* discretion—and I do not agree that it is—then it seems strange indeed that the statute is also invalidated because it purports to give the jury *too little* discretion by making the death penalty mandatory. Furthermore, if there is danger of freakish and too infrequent imposition of capital punishment under a mandatory system such as Louisiana's, there is very little ground for believing that juries will be any more faithful to their instructions under the Georgia and Florida systems where the opportunity is much, much greater for juries to practice their own brand of unbridled discretion.

In any event the plurality overreads the history upon which it so heavily relies. Narrowing the categories of crime for which the death penalty was authorized reflected a growing sentiment that death was an excessive penalty for many crimes, but I am not convinced, as apparently the plurality is, that the decision to vest discretionary sentencing power in the jury was a judgment that mandatory punishments were excessively cruel rather than merely a legislative response to avoid jury nullifications which were occurring with some frequency. That legislatures chose jury sentencing as the least troublesome of two approaches hardly proves legislative rejection of mandatory sentencing. State legislatures may have preferred to vest discretionary sentencing power in a jury rather than to have guilty defendants go scot-free; but I doubt that these events necessarily reflect

an affirmative legislative preference for discretionary systems or support an inference that legislatures would have chosen them even absent their experience with jury nullification.

Nor does the fact that juries at times refused to convict despite the evidence prove that the mandatory nature of the sentence was the burr under the jury's saddle rather than that one or more persons on those juries were opposed in principle to the death penalty under whatever system it might be authorized or imposed. Surely if every nullifying jury had been interrogated at the time and had it been proved to everyone's satisfaction that all or a large part of the nullifying verdicts occurred because certain members of these juries had been opposed to the death penalty in any form, rather than because the juries involved were reluctant to impose the death penalty on the particular defendants before them, it could not be concluded that either those juries or the country had condemned mandatory punishments as distinguished from the death penalty itself. The plurality nevertheless draws such an inference even though there is no more reason to infer that jury nullification occurred because of opposition to the death penalty in particular cases than because one or more of the 12 jurors on the critical juries were opposed to the death penalty in any form and stubbornly refused to participate in a guilty verdict. Of course, the plurality does not conclude that the death penalty was itself placed beyond legislative resuscitation either by jury nullification under mandatory statutes or by the erosion of the death penalty under the discretionary-sentencing systems that led to the judgment in *Furman* v. *Georgia.* I see no more basis for arriving at a contrary conclusion with respect to the mandatory statutes.

Louisiana and North Carolina have returned to the

mandatory capital punishment system for certain crimes.[8]
Their legislatures have not deemed mandatory punish-
ment, once the crime is proved, to be unacceptable; nor
have their juries rejected it, for the death penalty has
been imposed with some regularity. Perhaps we would

---

[8] It is unclear to me why, because legislatures found shortcomings
in their mandatory statutes and decided to try vesting absolute
discretion in juries, the legislatures are constitutionally forbidden to
return to mandatory statutes when shortcomings are discovered
in their discretionary statutes. See *Furman* v. *Georgia*. Florida
has in effect at the present time a statute under which the
death penalty is mandatory whenever the sentencing judge finds
that statutory aggravating factors outweigh the mitigating factors.
Georgia has in effect a statute which gives the sentencer discretion
in every case to decline to impose the death penalty. If Florida
and all other states like it choose to adopt the Georgia statutory
scheme, will the Eighth Amendment prevent them from later chang-
ing their minds and returning to their present scheme? I would
think not.

Most of the States had in effect prior to *Furman* v. *Georgia*
statutes under which even the least culpable first-degree mur-
derer could be put to death. I simply cannot find from the
decision to adopt such statutes a constitutional rule preventing the
States from removing the standardless nature of sentencing under
such statutes and replacing them with statutes under which all or
a substantial portion of first-degree murderers are put to death.

This is particularly true in Louisiana. The most that the plu-
rality can possibly infer from its own description of the history of
capital punishment in this country is that the legislatures have
rejected the proposition that *all* first-degree murderers should be
put to death. This is so because the only mandatory statutes
which were historically repealed or replaced were those which
made death the mandatory punishment for *all* first-degree murders.
Louisiana has now passed a statute which makes death the
mandatory penalty for only five narrow categories of first-degree
murder, not for all first-degree murders by any means. The his-
tory relied upon by the plurality is utterly silent on society's reaction
to such a statute. It cannot be invalidated on the basis of contem-
porary standards because we do not know that it is inconsistent
with such standards.

prefer that these States had adopted a different system, but the issue is not our individual preferences but the constitutionality of the mandatory systems chosen by these two States. I see no warrant under the Eighth Amendment for refusing to uphold these statutes.

Indeed, the more fundamental objection than the plurality's muddled reasoning is that in *Gregg* v. *Georgia*, *ante*, at 174–176, it lectures us at length about the role and place of the judiciary and then proceeds to ignore its own advice, the net effect being to suggest that observers of this institution should pay more attention to what we do than what we say. The plurality claims that it has not forgotten what the past has taught about the limits of judicial review; but I fear that it has again surrendered to the temptation to make policy for and to attempt to govern the country through a misuse of the powers given this Court under the Constitution.

## V

I conclude that § 14:30 of the Louisiana statutes imposing the death penalty for first-degree murder is not unconstitutional under the Eighth Amendment. I am not impressed with the argument that this result reduces the Amendment to little more than mild advice from the Framers to state legislators. *Weems, Trop,* and *Furman* bear witness to the contrary.

For the foregoing reasons, I dissent.

MR. JUSTICE BLACKMUN, dissenting.

I dissent for the reasons set forth in my dissent in *Furman* v. *Georgia*, 408 U. S. 238, 405–414 (1972), and in the other dissenting opinions I joined in that case. *Id.*, at 375, 414, and 465.